<table>
<tr><td colspan="2"><strong>ADVERSARY PROCEEDING COVER SHEET</strong><br>(Instructions on Reverse)</td><td><strong>ADVERSARY PROCEEDING NUMBER</strong><br>(Court Use Only)</td></tr>
</table>

| **PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| DAVID LEWI-EMMANUEL STOCKMAN<br>Debtor and Debtor in Possession, Pro Se | ZIAD DAOUD, Ph.D.<br>2138 N. Celena Drive<br>Midland, MI 48642 |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br><br>PRO SE<br>5805 McCarty Road<br>Saginaw, MI 48603<br>Tel: 989-341-3017 | **ATTORNEYS** (If Known)<br>None known |
| **PARTY** (Check One Box Only)<br>☒ Debtor　　☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor　☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor　　☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor　☒ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Recovery of bankruptcy-estate money and property arising from breach of an oral or implied property-investment agreement, unjust enrichment, restitution, accounting, equitable lien, and constructive trust. 11 U.S.C. §§ 541(a), 1107(a); Fed. R. Bankr. P. 6009, 7001(a); Michigan contract and equitable law.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☒ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(h) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

☒ ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23

☐ Check if a jury trial is demanded in complaint | Demand $ 244,782.21

**Other Relief Sought**
Accounting; proportional sale proceeds; equitable lien; constructive trust; prejudgment and postjudgment interest; taxable costs; alternative return of at least $97,668.10.

**B1040 (FORM 1040) (12/24)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | | |
|---|---|---|---|
| NAME OF DEBTOR<br>DAVID LEWI-EMMANUEL STOCKMAN | | BANKRUPTCY CASE NO.<br>26-20982-dob | |
| DISTRICT IN WHICH CASE IS PENDING<br>Eastern District of Michigan | | DIVISION OFFICE<br>Northern Division - Bay City | NAME OF JUDGE<br>Daniel S. Opperman |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | | |
| PLAINTIFF | DEFENDANT | | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ David Lewi-Emmanuel Stockman | | | |
| DATE<br><br>July 26, 2026 | | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>David Lewi-Emmanuel Stockman, Pro Se | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

In re:
**DAVID LEWI-EMMANUEL STOCKMAN,**

*Debtor.*

_____/

DAVID LEWI-EMMANUEL STOCKMAN,
Debtor and Debtor in Possession,
*Plaintiff,*
v.
ZIAD DAOUD, Ph.D.,
*Defendant.*

_____/

**Chapter 11**
Subchapter V

**Case No. 26-20982-dob**

**Adv. Proc. No. _____**

Hon. Daniel S. Opperman

## VERIFIED ADVERSARY COMPLAINT TO RECOVER $244,782.21 PROPERTY-INVESTMENT CLAIM, PLUS INTEREST, AND STATEMENT OF RELATED FACTS SUPPORTING POTENTIAL MHC JOINDER

Plaintiff David Lewi-Emmanuel Stockman ("Plaintiff"), the debtor and debtor in possession in the above-captioned Chapter 11 case, files this Verified Adversary Complaint against Defendant Ziad Daoud, Ph.D. ("Daoud"), and alleges as follows:

### NATURE OF THE ACTION

1. This action seeks recovery of $244,782.21 as Plaintiff's proportional interest in the appreciation and sale proceeds of Daoud's original Michigan residence at 3113 Valley Drive. Plaintiff contributed $97,668.10 toward Daoud's relocation, acquisition, preservation, taxes, and improvement of that property: $54,668.10 in immigration-related expenditures enabling Daoud and his family to relocate and establish the household; $13,000.00 for renovations; and $30,000.00 used to pay delinquent or outstanding property taxes and preserve the property.

2. The advances paid immigration counsel, government filing charges, premium-processing charges, administrative charges, and related costs for a consultation, an H-1B petition, premium processing,

DS-260 immigrant-visa matters, a J-1 waiver for Rola, and one-step I-140 and I-485 permanent-residence matters for the family.

3. The final one-step professional fee was $5,000 per family member. For six family members, that professional fee was $30,000. Adding the $6,625 filing charges and $300 administrative charge for that phase produced a one-step total of $36,925 and an aggregate advance of $54,668.10.

4. Plaintiff also personally loaned or advanced $13,000.00 for renovations to Daoud's residence. A contemporaneous January 25, 2021 contractor email itemized $10,900.00 in trim materials, trim finishing, and stairway work "up to date," stated that base-and-case installation costs were still unknown, and asked Plaintiff and Daoud how the work should be invoiced.

5. None of the immigration, renovation, or property-tax contributions was intended as a gift, wage, bonus, or gratuitous employment benefit. Plaintiff made the contributions as an investment in Daoud's acquisition, preservation, and improvement of the Valley Drive property, with the understanding, express or implied from the parties' words, conduct, relationship, purpose of the payments, and Daoud's acceptance of the benefits, that Plaintiff would be repaid from or participate proportionally in the property's equity, appreciation, or sale proceeds.

6. Daoud accepted and retained the full benefit of all three categories of property-related investment contributions but has not paid Plaintiff any portion of the sale proceeds, appreciated value, or return on the $97,668.10 invested. The advances arose in the context of Daoud's employment by Covenant Pathology Associates, P.C., later known as Michigan Health Clinics, P.C. (collectively, "MHC"). That employment relationship, MHC's CMU contract, Daoud's abrupt immediate resignation on October 2, 2023, and his immediate transition to MyMichigan Health and direct CMU work explain why the advances were not gifts and why repayment became due no later than his departure.

7. MHC possesses separate corporate claims arising from the same employment relationship, including claims concerning Daoud's immediate resignation, the ninety-day notice obligation, the noncompetition and noninterference covenants, the diversion of the CMU relationship, CMU's receipt

and nonpayment of the July-through-September 2023 invoice, and MyMichigan Health's alleged recruitment and employment of Daoud with knowledge of those restrictions. Those corporate claims are not included in Plaintiff's $97,668.10 personal recovery and are pleaded only as related background and as a joinder-ready factual record.

8. This action remains focused on Plaintiff's own bankruptcy estate and the $244,782.21 property-investment claim owed directly to Plaintiff. Plaintiff does not purport to represent MHC or to recover MHC's separate damages. The related corporate facts are pleaded because they bear on Daoud's credibility, the parties' course of dealing, when repayment became due, and the circumstances of Daoud's repudiation, and because they permit MHC, through licensed counsel, to seek joinder or amendment without rebuilding the factual record from the beginning.

**PARTIES**

9. Plaintiff is an individual residing in Saginaw County, Michigan. He is the debtor and debtor in possession in In re David Lewi-Emmanuel Stockman, Case No. 26-20982-dob, a Chapter 11 case proceeding under Subchapter V in this Court.

10. Under 11 U.S.C. § 1107(a) and Federal Rule of Bankruptcy Procedure 6009, Plaintiff may prosecute claims that are property of his bankruptcy estate.

11. Daoud is an individual who, upon information and belief, resides in Midland County, Michigan and works in Michigan. He may be served under Federal Rule of Bankruptcy Procedure 7004.

12. MHC is a Michigan professional corporation and is legally distinct from Plaintiff. Plaintiff was an officer and authorized representative of MHC but cannot appear pro se on MHC's behalf.

13. MyMichigan Health is a Michigan health system operating in Midland and other locations. The precise legal identity of the entity that recruited and employed Daoud should be confirmed through discovery before any corporate claim is formally added.

3

14. CMU is a Michigan constitutional university and body corporate. George E. Kikano, M.D. ("Kikano"), served as CMU's Vice President for Health Affairs and Dean of the College of Medicine during the relevant period, previously recruited Plaintiff to CMU, introduced Plaintiff to Daoud in 2020, and signed the CMU-MHC Professional Services Agreement.

## JURISDICTION, REFERRAL, VENUE, AND CONSENT

15. The United States District Court for the Eastern District of Michigan has jurisdiction under 28 U.S.C. § 1334(b) because Plaintiff's personal reimbursement claims are related to his pending bankruptcy case.

16. This proceeding is referred to this Court under E.D. Mich. LR 83.50(a).

17. This is an adversary proceeding under Federal Rule of Bankruptcy Procedure 7001(a) because Plaintiff seeks to recover money belonging to the bankruptcy estate.

18. The personal claim arose before the petition date and became property of the estate under 11 U.S.C. § 541(a)(1). Recovery will increase assets available to fund Plaintiff's Subchapter V reorganization and creditor distributions.

19. The state-law causes of action are non-core but related proceedings under 28 U.S.C. § 157(c). Plaintiff consents to the Bankruptcy Court entering final orders and judgment. If Daoud does not consent, Plaintiff requests proposed findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1).

20. Venue is proper under 28 U.S.C. § 1409(a) because Plaintiff's bankruptcy case is pending in this District.

21. The Court may exercise personal jurisdiction under Federal Rule of Bankruptcy Procedure 7004(f) because Daoud resides, works, and engaged in the relevant conduct in Michigan.

22. No direct claim is presently asserted by Plaintiff against CMU. Any direct MHC claim against CMU must be evaluated by MHC's counsel for sovereign-immunity, Court of Claims, notice, limitations, prior-action, and claim-splitting issues before joinder or separate filing.

FACTUAL ALLEGATIONS

**A. Plaintiff's Prior CMU Relationship with Kikano and the 2020 Introduction**

23. Before the Daoud employment arrangement, Plaintiff served as a faculty member and employee of the Central Michigan University College of Medicine for approximately two years.

24. Kikano personally recruited Plaintiff to CMU and structured or approved Plaintiff's faculty arrangement so that Plaintiff could continue maintaining his independent medical and pathology practice while simultaneously teaching and performing services for CMU.

25. During those approximately two years, Plaintiff received the highest faculty evaluations and recognition at the College of Medicine and was regarded by Plaintiff and others as the College's top-performing professor. Plaintiff will produce the supporting evaluations, awards, or testimony available to him.

26. Through that prior relationship, Kikano knew Plaintiff personally, knew Plaintiff's medical and pathology practice, knew Plaintiff was capable of employing and professionally supporting a clinical microbiologist, and knew the distinction between Plaintiff individually and Plaintiff's corporate medical practices.

27. In or about 2020, Kikano contacted Plaintiff, introduced him to Daoud, and asked whether Plaintiff and Daoud could partner so that Daoud could come to the United States, obtain professional employment, and perform clinical, academic, microbiology, research, and public-health work.

28. Kikano described Daoud as a close family friend and represented that he had a longstanding personal relationship with Daoud's family. Plaintiff understood that Kikano had been a friend of Daoud's brother in Lebanon and that Daoud's brother held the rank of general in the Lebanese military.

29. Plaintiff relied on Kikano's introduction, existing professional relationship, and request when Plaintiff agreed to employ Daoud through Covenant Pathology Associates, P.C./MHC, support the immigration process, and personally advance substantial immigration expenses for Daoud, his wife, and their four children.

30. Kikano therefore had direct, preexisting knowledge of the origin and purpose of Daoud's United States employment, MHC's role as employer and immigration sponsor, Plaintiff's personal financial assistance to the family, and the later CMU arrangement under which MHC supplied Daoud's services to CMU.

31. These facts are relevant to knowledge, intent, inducement, justification, concealment, and causation if MHC, through counsel, later asserts that Kikano, CMU personnel, MyMichigan, or others knowingly facilitated Daoud's departure, competing employment, or diversion of the CMU relationship.

### B. Daoud's Employment and the Parties' Relationship

32. On February 20, 2020, MHC, then operating as Covenant Pathology Associates, P.C., and Daoud executed a written Employment Agreement. Plaintiff signed the agreement only in his capacity as the employer's representative. A true copy is attached as Exhibit A.

33. The Employment Agreement provided for Daoud to perform full-time clinical, research, academic laboratory medicine, microbiology, public-health-administration, and consulting services beginning October 1, 2020.

34. The Employment Agreement stated a $100,000 annual salary and identified vacation, continuing-education reimbursement, hospital dues, malpractice insurance, health insurance, and potential future equity discussions. It did not state that Plaintiff personally would gift or permanently absorb immigration costs for Daoud, his wife, or his children.

6

35. Paragraph 5 required either party to provide ninety days' written notice of termination and required Daoud to continue performing services during that notice period if requested.

36. Paragraph 14 imposed a three-year restrictive period and a sixty-mile restricted area. It prohibited Daoud from working for a competitor in competing clinical, laboratory, or public-health services and from interfering with MHC's relationships with employees, contractors, suppliers, or customers with whom he had non-incidental contact through MHC.

37. Paragraph 14 also recognized MHC's right to actual damages, injunctive relief, and other legal and equitable remedies for actual or threatened breach.

### C. Plaintiff's Personal Immigration Advances for Six Family Members

38. Beginning in April 2020 and continuing through at least April 2021, Daoud requested, authorized, or knowingly accepted Plaintiff's payment of immigration expenses for Daoud and his family.

39. Plaintiff personally paid or caused to be paid the professional fees, filing fees, administrative charges, premium-processing charges, and convenience charges reflected in the immigration fee-and-payment summary attached as Exhibit B.

40. The beneficiaries were Daoud, his wife Rola, and their four children. The purpose was to obtain or advance immigration status, visas, waivers, and permanent-residence processing for the entire six-person family.

41. The contemporaneous summary initially reflected partial one-step professional-fee payments. The final agreement for the one-step phase was $5,000 for each of six family members, or $30,000 in professional fees, rather than $7,500 total.

42. The total immigration amount paid or advanced by Plaintiff was $54,668.10. The aggregate personal advances, including the separate $13,000.00 house-renovation loan, are summarized as follows:

| Matter | Calculation / basis | Amount |
|---|---|---|
| Consultation | Professional fee paid April 17, 2020 | $200.00 |

7

| Matter | Calculation / basis | Amount |
|---|---|---|
| H-1B / Form I-129 | Professional fees, filing fees, administrative charge, and convenience charges shown paid | $7,696.70 |
| Premium processing for I-129 | Professional fee, filing fee, and convenience charge shown paid | $1,980.00 |
| DS-260 immigrant-visa matters | Professional fees for Daoud and family shown paid | $5,000.00 |
| J-1 waiver for Rola | Professional fees, filing fee, administrative charge, and convenience charge shown paid | $2,866.40 |
| One-step I-140 / I-485 matters | Final professional fee of $5,000 for each of six family members ($30,000), plus $6,625 filing charges and $300 administrative charge | $36,925.00 |
| House-renovation loan/advances | Trim materials, finishing, stairway work, installation, and related residential renovation costs | $13,000.00 |
| Additional personal loans | Personal loans advanced directly to Daoud for his personal use and benefit | $30,000.00 |
| AGGREGATE TOTAL | Total personally loaned, paid, or advanced | $97,668.10 |

43. The calculation in Exhibit C reconciles the $54,668.10 immigration-related contribution, the $13,000.00 renovation contribution, and the $30,000.00 property-tax contribution, totaling $97,668.10 invested in Daoud's relocation, acquisition, preservation, and improvement of the Valley Drive residence. The same exhibit calculates Plaintiff's 24.4782% proportional interest and resulting $244,782.21 claim using the reported $1,000,000.00 sale price.

44. Plaintiff made these payments from personal resources or personal advances and did not intend them as a gift.

45. Daoud knew of, requested, accepted, and retained the benefit of the immigration work for himself, Rola, and the four children.

8

46. Daoud knew or reasonably should have known that a personal payment exceeding $54,000 for his family was expected to be repaid and was not included among the written compensation and benefits MHC promised in the Employment Agreement.

47. Plaintiff alleges that the repayment obligation was a personal loan or reimbursement obligation separate from any required employer-paid immigration charge. Plaintiff seeks the full $54,668.10. If Daoud contends that federal immigration law affects any discrete component, that issue can be allocated on the evidentiary record without converting the entire family-benefit advance into a gift.

### D. Plaintiff's Personal House-Renovation Advances

48. During 2020 and 2021, at Daoud's request and for the benefit of Daoud's personal residence, Plaintiff personally loaned or advanced funds to pay for trim materials, trim finishing, stair treads and risers, installation, and related renovation work.

49. On January 25, 2021, contractor Nathan Moeller sent an email to both Daoud and Plaintiff with the subject "Ziad job." The email itemized $5,600.00 for trim material, $4,100.00 for finishing all trim, and $1,200.00 for installing two stairways' treads and risers, for a subtotal of $10,900.00 "up to date." A true copy is attached as Exhibit F.

50. Moeller further stated that the cost to install the base and case was not yet known, that he was attempting to arrange the trim installation, and that Plaintiff and Daoud should advise how the work should be invoiced. The email therefore confirms that $10,900.00 was an interim subtotal rather than the final renovation cost.

51. Plaintiff personally paid or advanced the itemized amounts and additional installation and related renovation costs, bringing the total house-renovation advances to $13,000.00. Plaintiff presently seeks $13,000.00 for that loan and reserves the right to conform the amount to the precise contractor and payment records obtained in discovery.

9

52. The house-renovation contributions were not wages, compensation, an MHC business expense, or a gift. They were part of Plaintiff's investment in the Valley Drive property and were made with the expectation that Plaintiff would share proportionally in the property's equity, appreciation, or sale proceeds.

53. Daoud knew of and accepted the materials and work at his residence, was a direct recipient of the contractor's contemporaneous email, and knew or reasonably should have known that Plaintiff expected repayment.

54. Daoud has not repaid any portion of the $13,000.00 house-renovation advances.

**D-1. Daoud's Acquisition, Improvement, and Sale of the Valley Drive Residence**

54(a). When Daoud first relocated to Michigan, Plaintiff materially assisted him in acquiring and establishing his original Michigan residence at 3113 Valley Drive, Midland, Michigan. The residence was purchased in approximately December 2020 for $399,000.00.

54(b). In addition to the $13,000.00 renovation contribution, Plaintiff contributed $30,000.00 to pay property taxes when Daoud was behind. Those payments preserved the Valley Drive property, prevented further delinquency or enforcement, and protected the equity that Daoud later realized upon sale.

54(c). Plaintiff's immigration-related contributions, $30,000.00 property-tax contributions, and $13,000.00 renovation contributions enabled Daoud and his family to relocate, acquire and retain the Valley Drive residence, preserve its equity, improve the property, and maintain household liquidity while Daoud became established in the United States.

54(d). Publicly available property-history information reflects that the Valley Drive residence was acquired for approximately $399,000.00 in December 2020 and was marketed and reported as sold in 2024 for approximately $1,000,000.00. A separate property-record screenshot reports a June 21, 2024 warranty-deed transaction at $760,000.00. Because those records reflect different transaction amounts, Plaintiff pleads the 2024 disposition and proceeds on information and belief and requests an

10

accounting and production of the closing statement, deed, settlement statement, mortgage payoff, and net-proceeds records.

54(d)(1). After the Valley Drive sale or transfer, Daoud and his spouse acquired and moved to a separate, newer residence at 2138 N. Celena Drive, Midland, Michigan. The Celena Drive property is not the property improved by Plaintiff. It is relevant as a later-acquired asset into which the Valley Drive proceeds may have been transferred. Plaintiff seeks tracing discovery, but requests an equitable lien or constructive trust against that later property only to the extent identifiable Valley Drive proceeds can be traced into it.

54(e). Despite realizing substantial proceeds and appreciation from the 2024 disposition of the Valley Drive residence, Daoud did not pay Plaintiff any portion of the $244,782.21 proportional property-investment amount, return any portion of the $97,668.10 invested, or account for the sale proceeds.

54(f). Plaintiff alleges that the parties treated the contributions as an investment in Daoud's acquisition, preservation, and improvement of the Valley Drive residence and not as gifts. Plaintiff seeks an accounting, payment of his proportional interest, restitution, disgorgement, an equitable lien, and a constructive trust against traceable sale proceeds and property acquired with those proceeds, to the fullest extent permitted by law. In the alternative, if the Court does not find an investment or equity-sharing agreement, Plaintiff seeks repayment of no less than the $97,668.10 contributed, plus interest and costs.

54(g). Using the reported $399,000.00 acquisition price and the presently pleaded $97,668.10 in advances, Plaintiff's advances equal approximately 24.4782% of the acquisition price. If the Court finds an equity-sharing or investment agreement and uses the reported $1,000,000.00 sale price, the proportional value would be approximately $244,782.21, consisting of return of the $97,668.10 principal plus approximately $147,114.11 as the proportional share of the $601,000.00 gross appreciation before transaction costs, mortgage payoff, taxes, and other adjustments.

11

54(h). If the legally operative transfer price was instead $760,000.00, the same 24.4782% proportional calculation would equal approximately $186,034.48, consisting of return of the $97,668.10 principal plus approximately $88,366.38 as the proportional share of the $361,000.00 gross appreciation before transaction costs, mortgage payoff, taxes, and other adjustments.

54(i). Plaintiff pleads $244,782.21 as the primary measure of his proportional property-investment claim, subject to confirmation of the final sale price and a full accounting. If the Court determines that the investment agreement cannot be enforced as an equity-sharing agreement, Plaintiff alternatively seeks return of no less than the $97,668.10 invested, plus prejudgment interest, postjudgment interest, and costs.

### D-2. REPORTED PRE-DEPARTURE COMMUNICATIONS WITH RANDY TASHJIAN

54(j). Cullen James, another former MHC employee, informed Plaintiff on multiple occasions that Daoud had been communicating with Randy Tashjian before Daoud left MHC. Plaintiff pleads those reports on information and belief and seeks confirmation through James's testimony, Daoud's and Tashjian's communications, telephone records, and discovery.

54(k). Tashjian had been adverse to Plaintiff in litigation beginning in approximately 2021. Plaintiff further alleges that Tashjian had participated with Russell Bush and others in conduct that Plaintiff contends contributed to the progressive destruction of Plaintiff's forensic-services company and to an MCA-related claim that was later dismissed. These allegations are included to explain the asserted motive and context for the reported communications and are not pleaded as independently adjudicated facts unless established by the cited proceedings and discovery.

54(l). On information and belief, the Daoud-Tashjian communications concerned or assisted Daoud's planned departure from MHC, and Daoud and Tashjian at one point reportedly proposed or considered using the same attorney. Plaintiff seeks discovery concerning the timing, content, purpose, participants, and legal or employment assistance reflected in those communications.

54(m). These reported communications are relevant to Daoud's intent, the timing and coordination of his abrupt departure, his decision not to honor Plaintiff's property-investment rights after receiving the Valley Drive sale proceeds, and MHC's potential separate claims. Plaintiff does not presently assert an independent tort claim against Tashjian in this adversary complaint.

### E. MHC's Professional Services Relationship with CMU

55. On November 23, 2020, CMU and MHC executed a Professional Services Agreement. A true copy is attached as Exhibit D.

56. The agreement expressly identified Daoud as MHC's employee and required MHC to assign him to provide ten hours per week of professional teaching, research, and service activities for CMU.

57. The original agreement required CMU to pay MHC - not Daoud individually - in equal monthly installments. It also provided that MHC was an independent contractor and that CMU had no employer-employee relationship with MHC or Daoud.

58. Kikano signed the agreement for CMU as Vice President for Health Affairs and Dean of the College of Medicine. He therefore had direct knowledge that Daoud was MHC's employee, that MHC supplied his CMU services, and that CMU's payment obligation ran to MHC.

59. The parties renewed or extended the relationship after the original term. CMU later asserted that the final written renewal ended June 30, 2023 and that the agreement contained no automatic extension. CMU did not, however, provide MHC with timely advance notice that it intended to terminate or refuse renewal before Daoud continued performing CMU work into the next academic year. The parties' prior course of dealing, CMU's continued scheduling and acceptance of Daoud's

services, and CMU's knowledge that MHC continued paying him are relevant to extension, holdover, waiver, ratification, implied agreement, and unjust enrichment.

60. Notwithstanding CMU's asserted June 30, 2023 expiration date, Daoud continued devoting MHC-paid work time to CMU during July, August, and September 2023. He continued going to his CMU office, checking experiments, attending meetings, performing research and student follow-up, developing or working on class programming, and preparing for scheduled academic activities while he remained an MHC employee and while MHC continued carrying his salary and employment obligations.

61. MHC invoiced CMU $4,028.42 for each of July, August, and September 2023, for a total of $12,085.26. The invoice, dated August 23, 2023, is attached as Exhibit E. The invoice was transmitted on August 24, 2023 to Kikano and CMEDFinance@cmich.edu. CMU's later emails addressing the invoice and offering $600 for Daoud's August 10, 2023 orientation presentation confirm receipt and knowledge of the demand, even though CMU disputed the full amount.

62. CMU has not paid the $12,085.26. CMU asserted that Daoud did not teach regular classes during the summer and that the written renewal had ended. That position improperly equates Daoud's CMU responsibilities with classroom teaching alone. The CMU agreement required teaching, research, and service activities. A medical school does not cease research, experiments, curriculum development, meetings, student supervision, orientation, office work, and preparation merely because regular classroom sessions are reduced or absent during part of the summer. CMU itself acknowledged Daoud's August 10, 2023 orientation presentation and offered to pay his employer for that work.

62A. Daoud contemporaneously identified specific fall teaching dates for September 29, October 11, October 13, November 6, November 22, and December 13, 2023, and further stated that he met with students in the laboratory every other Wednesday for research work and follow-up. These were not speculative future possibilities; they were scheduled responsibilities associated with his continuing CMU role. It is therefore implausible that CMU had simply ended the relationship and

14

expected no further services. The more reasonable inferences are that CMU intended to renew or continue the MHC arrangement, or that CMU and Daoud intended to move the same teaching, research, and service work into a direct arrangement with Daoud after his departure from MHC. Discovery is required to determine which occurred.

63. Those facts support MHC's position that: (a) the relationship continued by extension, course of dealing, holdover, waiver, ratification, or implied agreement; (b) CMU knowingly accepted valuable services while MHC continued paying Daoud; (c) CMU is liable at minimum for the reasonable value of accepted services under implied-contract, quantum-meruit, or unjust-enrichment principles; (d) CMU's records, Daoud's office access, calendars, experiments, research work, curriculum work, student supervision, orientation work, and scheduled fall assignments will establish the extent of the continued services; and (e) the continuation of scheduled fall duties makes it substantially more likely that CMU intended either to renew the MHC arrangement or to transition the same work directly to Daoud rather than actually discontinue the services.

### F. Daoud's Abrupt Departure, H-1B Timing, and Immediate Competing Work

64. On October 2, 2023, Daoud, through counsel, gave notice that he was resigning effective immediately.

65. Daoud did not provide the contractually required ninety days' written notice and did not provide the transition period required by the Employment Agreement.

66. Upon information and belief, Daoud had arranged or materially advanced his next employment before the immediate resignation.

67. Immediately after leaving MHC, Daoud assumed a laboratory or microbiology leadership role with MyMichigan Health in Midland and continued or began direct work for CMU as a professor or part-time faculty member. Daoud's October 23, 2023 LinkedIn profile identified him simultaneously

as MyMichigan's full-time Microbiology Director beginning October 2023 and as a part-time CMU College of Medicine professor, corroborating the overlap in the roles.

68. MyMichigan operated within the Employment Agreement's restricted area and competed in clinical laboratory, microbiology, diagnostic, and public-health services of the type Daoud performed for MHC.

69. Daoud's direct CMU work was the same as or substantially similar to the teaching, research, and professional services that MHC had supplied to CMU through Daoud.

70. Kikano had direct knowledge of MHC's employment and CMU contractual relationships because he signed and administered the CMU agreement, had previously recruited Plaintiff, and had introduced Daoud to Plaintiff. Plaintiff alleges on information and belief that Kikano used those relationships and his institutional influence to help Daoud obtain the MyMichigan position and to facilitate Daoud's transition away from MHC and toward direct CMU work. The exact communications, participants, offer terms, recommendations, and coordination require discovery.

71. The abrupt timing - immediate resignation followed by immediate competing and direct-customer work - supports the inference that the transition was planned before October 2, 2023 and was not an unplanned post-resignation development.

72. Plaintiff understands that Daoud's initial H-1B approval period ended on or about September 30, 2023. Daoud resigned effective immediately on October 2, 2023 - essentially three years to the day after his MHC employment began and immediately after the expected end of the initial H-1B period.

73. Plaintiff does not allege that immigration law required Daoud to remain employed by MHC. Daoud could seek lawful immigration authorization to change employers. The relevant point is that any visa expiration, extension, portability, or employer-change process did not itself cancel Daoud's separate contractual duties to provide ninety days' notice, avoid prohibited competition, and refrain from interfering with MHC's customer relationships.

16

74. By its terms, the Employment Agreement prohibited Daoud during the restrictive period from accepting competing clinical, laboratory, microbiology, or public-health work within the restricted area and from interfering with MHC's relationship with CMU. The agreement did not prohibit Daoud from all work, but it restricted the particular MyMichigan and direct-CMU activities alleged here.

75. Upon information and belief, before October 2, 2023, Daoud specifically sought to contract with CMU in his own name and receive the CMU compensation directly, despite CMU's established arrangement with MHC and despite the noninterference covenant. Daoud maintained an office at CMU and continued using MHC-paid time for CMU work. Text messages and emails involving Kikano allegedly reflect Daoud's continuing CMU role, office access, direct-contract request, scheduled fall teaching and research obligations, and Kikano's assistance in obtaining the MyMichigan position.

76. Upon information and belief, Daoud assumed or attempted to assume for himself the same CMU teaching, research, curriculum, experiment, student-supervision, and service work that CMU had previously purchased from MHC, and sought or arranged for CMU to pay him directly rather than paying MHC. MHC is entitled to discovery and, if supported, an accounting and disgorgement of compensation attributable to diverted MHC work.

77. CMU's position that its written renewal with MHC ended June 30, 2023 is difficult to reconcile with the contemporaneous evidence that Daoud continued using a CMU office, checking experiments, attending meetings, working with students, performing curriculum or class-programming work, appearing at orientation, and holding scheduled fall teaching and research responsibilities. Those facts support MHC's contention that the services were continuing and that the relationship was being renewed, held over, or diverted to Daoud directly rather than actually terminated.

78. Kikano's prior recruitment of Plaintiff, his 2020 introduction of Daoud, his longstanding personal relationship with the Daoud family, his execution of the CMU-MHC agreement, and his

17

knowledge that MHC employed and sponsored Daoud support the inference that Kikano knew of MHC's contractual and business interests when the transition occurred.

79. The precise dates and terms of Daoud's H-1B change-of-employer filing, MyMichigan offer and onboarding, any recommendation or introduction by Kikano, direct CMU appointment and compensation, CMU office access, calendars, course and curriculum assignments, experiments, research meetings, student supervision, and all communications among Daoud, Kikano, CMU, and MyMichigan are uniquely within Daoud's and the third parties' possession and should be established through document discovery, subpoenas, and depositions.

80. MHC previously prepared and verified a complaint alleging that Daoud breached the ninety-day notice provision, the noncompetition provision, and the noninterference provision by accepting MyMichigan employment and directly performing CMU services. MHC sought damages and injunctive relief.

### G. Repayment Became Due and Remains Unpaid

81. Plaintiff's willingness to invest $97,668.10 in immigration, renovation, and property-tax expenditures was based on the parties' relationship, Daoud's requests and acceptance, the direct connection between the expenditures and the Valley Drive household and property, and the understanding that Plaintiff would be paid from or participate in the property's resulting equity and sale proceeds rather than permit Daoud to retain the entire windfall.

82. No signed promissory note fixed a calendar repayment date. Under the parties' circumstances, repayment was due within a reasonable time and, at the latest, when Daoud abruptly terminated the relationship on October 2, 2023 and immediately pursued competing employment and direct work with MHC's customer.

83. Any continued forbearance associated with Daoud's ongoing MHC employment ended when Daoud left without the promised notice or transition.

84. Daoud has not paid Plaintiff any portion of the $244,782.21 proportional property-investment claim or returned any portion of the $97,668.10 invested.

85. All personal loan claims existed before Plaintiff filed Chapter 11 and are property of the bankruptcy estate. Their collection is material to the funding and feasibility of Plaintiff's Subchapter V reorganization.

### RELATED CORPORATE CLAIMS AND JOINDER NOTICE

86. The corporate facts above overlap with Plaintiff's personal claims because the same employment relationship, witnesses, documents, timeline, and abrupt departure bear directly on whether the personal advances were gifts, when repayment became due, and Daoud's credibility and intent. Nevertheless, the relief requested in Counts I through IV is limited to Plaintiff's own $244,782.21 proportional property-investment claim, or alternatively return of the $97,668.10 invested, plus interest and costs.

87. MHC's potential claims include: (a) breach of the ninety-day notice and continued-service obligations; (b) breach of the noncompetition covenant through competing MyMichigan employment; (c) breach of the noninterference covenant through Daoud's effort to contract directly with CMU; (d) CMU breach, account stated, implied contract, quantum meruit, and unjust enrichment concerning the $12,085.26 invoice and accepted post-June 2023 services; (e) an accounting and, where legally supported, disgorgement of direct CMU compensation; (f) damages arising from diversion or loss of the CMU relationship; (g) tortious interference by the proper MyMichigan employing entity if discovery establishes knowledge and intentional procurement of breach; (h) tortious interference by responsible CMU actors if discovery establishes knowing diversion; and (i) civil conspiracy only to the extent supported by an underlying actionable tort and evidence of coordinated conduct.

88. MHC's proposed claims against Daoud include breach of the written Employment Agreement based on: (a) failure to provide ninety days' written notice and continue services during the notice

period; (b) accepting competing employment with MyMichigan within the three-year, sixty-mile restriction; (c) interfering with MHC's CMU relationship; (d) attempting to contract directly with CMU and obtain compensation that had been paid to MHC; and (e) causing transition, replacement, lost-revenue, and other provable damages.

89. Before adding MHC, counsel should confirm the status of the October 2023 MHC v. Daoud action and determine whether amendment, substitution, removal, consolidation, abstention, or a separate proceeding is required to avoid duplicative litigation or claim splitting.

90. Before asserting a direct federal claim against CMU, counsel should analyze CMU's status as a state constitutional entity, sovereign immunity, 11 U.S.C. § 106, Central Virginia Community College v Katz, 546 U.S. 356 (2006), Michigan Court of Claims jurisdiction, and the notice provisions of MCL 600.6431.

91. The common factual and legal questions include Daoud's employment duties, the validity and breach of the restrictive covenants, the timing and circumstances of his resignation, his continued CMU activities, any direct CMU compensation, communications among Daoud, Kikano, CMU, and MyMichigan, and the damages caused by the transition. Those common questions support joinder or coordinated adjudication while permitting separate damage awards to Plaintiff's estate and MHC without double recovery.

## FACTUAL AND LEGAL BASIS FOR POTENTIAL MHC JOINDER OR AMENDMENT

91A. The following identifies claims and relief that MHC may assert only after appearing through licensed counsel. They are not presently asserted by Plaintiff, do not enlarge Plaintiff's personal demand, and are included solely to preserve a complete common factual record for a procedurally proper motion for joinder or amended complaint.

91A-1. Upon appearance through licensed counsel, MHC may adopt the common factual allegations in this Complaint and add itself as a plaintiff without adopting, owning, or seeking recovery on Plaintiff's personal loan claims.

91B. Potential MHC claim - Breach of Employment Agreement against Daoud: MHC performed its obligations; Daoud failed to provide the required ninety days' notice, failed to continue services during that period, accepted competing work at MyMichigan within the restricted area and period, and interfered with MHC's CMU relationship. MHC may seek actual damages, lost profits proven with reasonable certainty, replacement and transition costs, prejudgment interest, costs, and any still-available equitable relief.

91C. Potential MHC claim - Breach of Contract and Account Stated against CMU: MHC supplied Daoud's teaching, research, experimental, programming, meeting, student-mentoring, orientation, office, and other professional services after June 30, 2023. CMU received Invoice No. 2006551 for $12,085.26, responded to the billing dispute, acknowledged post-June work, and failed to pay the full invoice. The existence of already-scheduled fall teaching dates, recurring student research meetings, office responsibilities, and continuing experiment and curriculum work supports the inference that CMU intended the relationship to continue and did not actually discontinue Daoud's services after June 30.

91D. Potential alternative MHC claims - Implied Contract, Quantum Meruit, and Unjust Enrichment against CMU in the alternative: even if CMU proves the last signed extension expired June 30, 2023, CMU knowingly accepted the benefit of Daoud's continuing work while MHC continued paying his compensation and permitting him to use MHC work time for CMU activities. The medical school's summer academic calendar did not eliminate research, experiments, programming, meetings, mentoring, office responsibilities, orientation, preparation, or already-scheduled fall teaching duties. CMU's continued scheduling of Daoud for fall activities supports the

21

inference that CMU intended either to continue the MHC arrangement or to contract with Daoud directly for substantially the same services.

91E. Potential MHC claim - Tortious Interference against MyMichigan: upon proof that the correct MyMichigan entity knew of Daoud's restrictive covenants and notice obligation, MHC may allege that MyMichigan intentionally and improperly procured or facilitated Daoud's breach by recruiting and employing him in restricted competing work and coordinating the transition before his resignation.

91F. Potential MHC relief - Accounting and Disgorgement: MHC may seek an accounting of all compensation, stipends, contract payments, benefits, or other value paid or promised by CMU or MyMichigan to Daoud for work diverted from MHC, and disgorgement to the extent permitted by law and supported by the evidence.

91G. MHC counsel should identify the precise MyMichigan defendant, evaluate the forum and sovereign-immunity issues applicable to CMU, confirm the status of the prior 2023 MHC action, and then proceed by joinder, amendment, consolidation, removal, or a separate coordinated action as procedurally appropriate.

91H. Because MHC is a separate corporation, only licensed counsel may sign and prosecute the proposed MHC counts. Plaintiff expressly preserves all MHC claims, seeks no corporate recovery in Counts I-IV, and requests no double recovery.

### COUNT I - BREACH OF ORAL AND IMPLIED-IN-FACT REIMBURSEMENT AGREEMENT - IMMIGRATION ADVANCES

92. Plaintiff incorporates paragraphs 1 through 91 as if fully restated.

93. Michigan law recognizes contracts formed by spoken words and by conduct demonstrating mutual assent. Daoud requested, directed, authorized, or knowingly accepted Plaintiff's personal payment of immigration expenses for Daoud and his family.

94. Plaintiff's payment of $54,668.10 constituted consideration and full performance.

95. Daoud received the direct and intended benefit of legal services and government processing for himself, his wife, and four children.

96. Daoud manifested assent by requesting, accepting, and retaining those benefits while knowing or having reason to know that Plaintiff expected repayment and had not promised a gift.

97. Because no fixed repayment date was stated, repayment was due on demand or within a reasonable time under the parties' circumstances and, at the latest, when Daoud abruptly terminated the relationship on October 2, 2023. See Jackson v Estate of Green, 484 Mich 209, 217; 771 NW2d 675 (2009).

98. Daoud materially breached the reimbursement agreement by failing to repay any portion of the $54,668.10.

99. The breach caused Plaintiff and the bankruptcy estate $54,668.10 in principal damages, plus lawful interest and costs.

## COUNT II - BREACH OF ORAL AND IMPLIED-IN-FACT LOAN AGREEMENT - HOUSE-RENOVATION ADVANCES

100. Plaintiff incorporates paragraphs 1 through 91 as if fully restated.

101. At Daoud's request and for Daoud's residential benefit, Plaintiff personally loaned or advanced $13,000.00 for materials, finishing, stairway work, installation, and related renovations.

102. The January 25, 2021 contractor email to both parties contemporaneously corroborates the project, identifies $10,900.00 in costs "up to date," confirms that installation charges remained outstanding, and asks how the work should be invoiced.

103. Plaintiff's payment or advancement of the renovation costs constituted consideration and full performance.

104. Daoud manifested assent by requesting or accepting the renovation work, receiving the direct benefit at his residence, participating in communications with the contractor, and retaining the improvements while knowing that Plaintiff expected repayment.

105. Because no fixed repayment date was stated, repayment was due on demand or within a reasonable time and, at the latest, when Daoud abruptly terminated the relationship on October 2, 2023. See Jackson, 484 Mich at 217.

106. Daoud materially breached the house-renovation loan agreement by failing to repay any portion of the $13,000.00.

107. The breach caused Plaintiff and the bankruptcy estate $13,000.00 in principal damages, plus lawful interest and costs.

107(a). The renovation advances enhanced or preserved Daoud's residential property and contributed to the value Daoud realized when the Valley Drive residence was sold or otherwise transferred in 2024.

107(b). Plaintiff primarily seeks repayment of the $13,000.00 renovation loan. In the alternative, if the evidence establishes an agreement that Plaintiff would participate in the property's appreciation or sale proceeds, Plaintiff seeks an accounting and the proportional or equitable relief supported by the evidence.

107(c). To prevent unjust enrichment and dissipation of traceable proceeds, Plaintiff requests an equitable lien or constructive trust only to the extent the Court finds the required facts and can trace Plaintiff's funds or their proceeds into property or assets retained by Daoud.

**COUNT III - BREACH OF ORAL AND IMPLIED-IN-FACT PROPERTY-INVESTMENT AGREEMENT - PROPERTY-TAX CONTRIBUTIONS**

108. Plaintiff incorporates paragraphs 1 through 107 as if fully restated.

109. In addition to the immigration-related and renovation contributions, Plaintiff contributed $30,000.00 to pay property taxes on the Valley Drive residence when Daoud was behind, thereby preserving the property and its equity.

110. The additional advances were loans, not gifts, wages, bonuses, or business expenses, and were made with the express or implied understanding that Daoud would repay Plaintiff.

111. Daoud requested, accepted, received, and retained the benefit of the $30,000.00 property-tax investment while knowing that Plaintiff expected to be repaid from or share proportionally in the property's equity, appreciation, or sale proceeds.

112. To the extent no fixed repayment date was stated, repayment was due upon demand or within a reasonable time and, at the latest, when Daoud abruptly terminated the parties' relationship on October 2, 2023.

113. Daoud sold or transferred the Valley Drive property but failed and refused to pay Plaintiff any proportional share attributable to the $30,000.00 property-tax investment or to account for the sale proceeds.

114. Daoud materially breached the oral and implied-in-fact loan agreement.

115. The breach contributed to Plaintiff's aggregate $244,782.21 property-investment damages. Alternatively, Plaintiff is entitled to return of the $30,000.00 property-tax contribution, plus lawful prejudgment interest, postjudgment interest, and costs.

## COUNT IV - UNJUST ENRICHMENT AND RESTITUTION (ALTERNATIVE)

116. Plaintiff incorporates paragraphs 1 through 115 as if fully restated.

117. This Count is pleaded in the alternative under Federal Rule of Civil Procedure 8(d), made applicable by Federal Rule of Bankruptcy Procedure 7008.

118. Plaintiff conferred direct, measurable property-related investment benefits totaling $97,668.10 on Daoud: $54,668.10 in immigration-related expenditures enabling the family's relocation and

establishment of the Valley Drive household; $13,000.00 in materials and work improving the residence; and $30,000.00 used to pay property taxes and preserve the property.

119. Daoud knew of, requested or accepted, and retained all three categories of benefits.

120. It would be inequitable for Daoud to retain the immigration benefits, the residential improvements, the additional personal-loan proceeds, and the value of Plaintiff's payments without reimbursement, particularly where Plaintiff undertook the advances in reliance on the parties' relationship and Kikano's personal introduction and request, and Daoud later abruptly left MHC and immediately accepted competing work.

121. If the Court finds no enforceable express or implied-in-fact property-investment agreement, the Court should imply an obligation in law and award restitution of no less than $97,668.10, together with any additional equitable relief supported by tracing and accounting evidence.

122. Plaintiff seeks one recovery only and does not seek duplicative damages under Counts I, II, III, and IV.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Daoud as follows:

A. Awarding $244,782.21 as Plaintiff's proportional property-investment interest, based on a 24.4782% interest in the reported $1,000,000.00 sale price, subject to confirmation through a full accounting;

A(1). Alternatively, if the Court does not enforce the equity-sharing measure, awarding no less than $97,668.10 as return of Plaintiff's invested principal, consisting of $54,668.10 in immigration-related contributions, $13,000.00 in renovation contributions, and $30,000.00 in property-tax contributions;

A(2). Ordering Daoud to provide a complete accounting of the acquisition, financing, improvements, taxes, sale or transfer, closing costs, mortgage payoff, net proceeds, and disposition of proceeds concerning 3113 Valley Drive;

A(3). Ordering payment of Plaintiff's proportional share of sale proceeds or appreciation established by the evidence, presently calculated at $244,782.21 using the reported $1,000,000.00 sale price, subject to a full accounting and lawful adjustments;

A(4). Imposing an equitable lien or constructive trust on identifiable and traceable proceeds or replacement property only to the extent authorized by law and supported by the evidence;

B. Awarding prejudgment interest under MCL 600.6013 and other applicable law;

C. Awarding postjudgment interest under 28 U.S.C. § 1961 until the judgment is paid;

D. Awarding taxable costs under Federal Rule of Bankruptcy Procedure 7054 and applicable law;

E. Determining any legally required allocation among the immigration charges and allowing the renovation amount to be conformed to the precise payment evidence, while entering judgment for the full lawful amount proven;

F. Declaring that this judgment does not adjudicate or release separate claims belonging to MHC; and

G. Granting such other lawful relief as the Court deems just and proper, without duplicative recovery.

Respectfully submitted,

/s/ David Lewi-Emmanuel Stockman
Debtor and Debtor in Possession, Pro Se
5805 McCarty Road
Saginaw, Michigan 48603
Telephone: (989) 341-3017
Email: dstockma4@icloud.com
Dated: July 26, 2026

27

# VERIFICATION UNDER 28 U.S.C. § 1746

I, David Lewi-Emmanuel Stockman, declare under penalty of perjury that I have reviewed this Verified Adversary Complaint; that the factual allegations based on my personal knowledge are true and correct, including my prior CMU employment, Kikano's recruitment and 2020 introduction of Daoud, the final $5,000-per-family-member immigration professional fee, my payment or contribution of $54,668.10 in immigration-related expenses, my assistance with Daoud's acquisition and retention of the Valley Drive residence, my $13,000.00 renovation contribution, my $30,000.00 in property-tax contributions, the parties' understanding that these expenditures were an investment in the Valley Drive property, Daoud's 2024 disposition of that property, and his failure to pay my proportional interest; and that allegations stated on information and belief, including the reported Daoud-Tashjian communications and tracing of sale proceeds into the Celena Drive property, are believed true after reasonable inquiry and are identified as such.

Executed on July 26, 2026.


/s/ David Stockman

David Stockman

**EXHIBIT INDEX**

The existing exhibits support the present complaint. Exhibit F corroborates the separate house-renovation transaction and its interim $10,900.00 subtotal. Exhibits G through J document Daoud's continuing CMU activities, CMU's receipt and response to the invoice, Daoud's public identification as both MyMichigan Microbiology Director and CMU professor, and Kikano's written position that the final renewal expired June 30, 2023. MHC counsel should additionally attach Kikano text messages, CMU office-access records, Daoud's calendars and experiment records, the MyMichigan offer and onboarding documents, CMU payment records, and any direct-contract communications. They also provide the foundational contract, invoice, service, notice, and employment evidence needed for MHC counsel to plead the proposed corporate counts. Exhibits K through M contain the presently available property-history records concerning 3113 Valley Drive and the later property identified as 2138 N. Celena Drive. The reported transaction amounts must be confirmed through certified deeds and closing records.

| Exhibit | Description |
|---------|-------------|
| A | February 20, 2020 Employment Agreement |
| B | Immigration Fee and Payment Summary |
| C | Calculation of Personal Advances (Immigration, House Renovation, and Additional Personal Loans) |
| D | November 23, 2020 CMU-MHC Professional Services Agreement |
| E | August 23, 2023 CMU Invoice for July-September 2023 Daoud FTE Contribution |
| F | January 25, 2021 Contractor Email - "Ziad job" |
| G | CMU Sessions and Continuing Summer/Academic Work |
| H | CMU Receipt, Response, and Dispute Concerning Daoud Services and Invoice |
| I | October 23, 2023 LinkedIn Profile - MyMichigan and CMU Roles |
| J | September 15, 2023 Kikano Email Regarding June 30, 2023 Expiration |

# EXHIBIT A
## FEBRUARY 20, 2020 EMPLOYMENT AGREEMENT

### EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT, dated as of the _20th_ day of February 2020, by and between COVENANT PATHOLOGY ASSOCIATES, P.C., a Michigan professional corporation (hereinafter referred to as "Employer"), and Ziad Daoud, Ph.D., (hereinafter referred to as "Employee"), is made and entered into at Saginaw, Michigan.

    1.    <u>Agreement to Perform Professional Services</u>. The Employer hereby engages the Employee to perform and the Employee hereby accepts such engagement and agrees to perform full-time services in clinical, research, and academic laboratory medicine and microbiology, as a research scientist, as a public health administrator, and consultant in connection with the professional practice conducted by the Employer and to perform such services as may be assigned by the Employer to the Employee in Employee's capacity and medical field. The Employee further agrees to be and it is an express condition of this Agreement that the Employee at all times during the existence of the Agreement be a person duly licensed to practice medicine and pathology in the State of Michigan, failing which Employee's employment and all rights and obligations under this Agreement shall immediately terminate.

    2.    <u>Compensation; Other Expenses</u>. In consideration of his services, the Employer agrees that during the term of this Agreement the Employee shall be paid a salary of $100,000.00 annually, payable in accordance with Employer's standard practices and subject to all withholdings. In addition, Employee shall receive annually 20 days of paid vacation (taken at the convenience of the Employer), up to $3,000.00 annual reimbursement for continuing education expenses, all hospital dues, professional liability (malpractice) insurance. Health insurance (BCBS) covered by Employer. Profit sharing determined at the end of the year.

    3.    <u>Term</u>. The term of this Agreement shall commence on October 1, 2020, and shall continue until this Agreement is terminated, as hereinafter provided.

    4.    <u>Duties of Employee</u>. The Employee shall, during the continuance of this Agreement, devote his full-time energies to the conduct of the business of the Employer and shall not engage in any other work except in the name of and on behalf of the Employer.

    5.    <u>Termination</u>. The Employer or the Employee may terminate this Agreement, with or without cause, at any time upon ninety (90) days' written notice to the other party. In either event, the Employee, if requested by the Employer, shall continue to render his services, and shall be paid his regular compensation up to the date of termination. If the Employee dies during the term of this Agreement, this Agreement shall terminate as of death. This Agreement is "at will" meaning either the Employer or its Employee may terminate for any reason or no reason.

    6.    <u>Compensation Upon Termination</u>. Upon any termination of this Agreement, the Employee shall receive all compensation due to him under this Agreement up to the date of termination, such compensation to be paid to him on said date.

    7.    <u>Reassignment of Benefits</u>. Employee shall reassign to the Corporation and execute any third party payment documents necessary to direct the reassignment of any and all reimbursement due Employee for his professional services from patients or third party payors with whom Employer has a participation agreement.



8.     Incapacity.  If the Employee should become incapacitated due to illness or injury, and substantially prevented from performing his duties hereunder, the Employee shall receive his full regular compensation as provided in Paragraph 2 hereof, during the first thirty (30) days of such incapacity, less any amounts paid to him under disability income insurance policies, the premiums for which have been paid by the Employer.  If the Employee shall be incapacitated for a period exceeding thirty (30) continuous days, such incapacity shall, at the option of the Employer, constitute a termination of employment.

9.     Notices. All notices under this Agreement shall be given in writing. Notice may be served on the Employee either personally or by registered mail at his last known address. Notice to the Employer may be made by giving notice to Covenant Pathology Associates PC.

11.     Entire Agreement. The foregoing Agreement contains the entire agreement of the parties hereto and no modifications hereof shall be binding upon the parties hereto unless the same is in writing signed by the respective ·parties hereto.

12.     Binding Effect. This Agreement shall bind and benefit the parties and their respective legal representatives, executors, administrators, subsidiaries, successors and assigns.

13.     Governing Law. This Agreement shall be governed by the laws of the State of Michigan.

14.     Covenant Not to Compete.  Upon termination of employment with Employer by Employee, whether voluntary or involuntary, Employee for a period of 3 years from such date of termination ("Restrictive Period") and within 60 miles of Employer's principal place of business or within 60 miles of any Hospital location, including, but not limited to, Covenant hospital (all locations), Saint Mary's Hospitals (all locations), Central Michigan University and all hospitals associated therewith, and those entities successors in interest ("Restrictive Area") shall not

(a)     own, finance, serve as an officer, director, or member of any governing board of, or lend Employer's name to, any business or person whose services compete with the Business of Employer (a "Competitor");

(b)     be employed by, advise, consult with or manage any Competitor with respect to performance of clinical, laboratory, or public health services that competes with the business of Employer in the Restricted Area with the Hospitals for which Employer provides clinical, laboratory, or public health services;

(c) whether for Employee's own account or the account of any other person, (i) solicit, as an employee, independent contractor or otherwise, any employee of Employer or in any manner induce or attempt to induce any employee of Employer to terminate employment with Employer, in each case with respect to a business whose activates compete in whole or in part with the activities of Employer in any area; or (ii) interfere with Employer's relationship with any person, including any person who is an employee, contractor, supplier or customer of Employer in the Restricted Area, in each case, to the extent Employee had non-incidental personal contact with such person by reason of Employee's connection with Employer.

2

The parties intend to protect and preserve the business and goodwill associated with the Employer. If any court of competent jurisdiction shall at any time deem the Restricted Period too lengthy or the Restricted Area too broad, or the scope of the covenants too broad, the Restricted Period and Restricted Area shall be deemed to be shortened to the longest period permissible by law, and the scope of the covenants shall be deemed to be limited to comprise the broadest scope permissible by law under the circumstances.

Employee recognizes and acknowledges that in the event of any default in, or breach of any of, the terms, conditions, or provisions of this Agreement (either actual or threatened) by Employee, Employer's remedies at law will be inadequate. Accordingly, if Employee shall breach any of the covenants set forth in this Agreement (either actual or threatened), Employer shall be entitled to one or more of the following remedies, which shall be cumulative (i) actual damages incurred as a result of the breach, (ii) injunctive or other equitable relief prohibiting Employee from continuing to engage in the prohibited activities, and (iii) other legal and equitable remedies as may be available under law and Employer shall not be obligated to post bond or other security in seeking such relief.

15. Equity Interest. The parties anticipate consideration and discussion of Employee becoming a shareholder in three (3) years from the date of commencement of employment with Employer, upon terms and conditions to be discussed and agreed by Employer and Employee at that time (and assuming Employee is at that time still employed by Employer).

IN WITNESS WHEREOF, the parties hereto have set their hands and seal the day and year first above written.

EMPLOYER:

COVENANT PATHOLOGY ASSOCIATES, P.C., a Michigan professional corporation

By: _____
David Stockman, M.D.

EMPLOYEE: _____

ZIAD DAOUD, PH.D.

3

# EXHIBIT B
## IMMIGRATION FEE AND PAYMENT SUMMARY

| Name of beneficiary | Type of case | TOTAL Professional Fees (PF) | Professio-nal fees (PF) PAID | Filing Fees PAID | Administrati ve costs PAID | Conveni ence fees PAID | Balance |
|---|---|---|---|---|---|---|---|
| **Ziad DAOUD** | Consult | $200 | $200 4/17/20 | N/A | N/A | N/A | None |
| | H-1B (I-129) | $5,000 | $3,000 4/22/20<br><br>$2,000 5/26/20 | $460 5/26/20<br><br>$2,000 6/22/21 | $125 5/26/20 | $60 4/22/20<br><br>$51.70 5/26/20 | None |
| | Premium processing For I-129 | $500 | $500 6/3/20 | $1,440 6/3/20 | N/A | $40 6/3/20 | None |
| | DS-260s for Ziad and family | $5,000 | $2,500 6/22/20<br><br>$2,000 8/24/20<br><br>$500 2/9/21 | N/A | N/A | | None |
| | J-1 waiver For Rola | $2,500 | $2,000 6/24/20<br><br>$500 2/9/21 | $120 6/24/20 | $200 6/24/20 | $46.40 6/24/20 | None |
| | One-step (I-140 + I-485s for Ziad and family | $12,500 | $7,500 3/22/21 | $6,625 4/26/21 | $300 4/26/21 | N/A | $5,000 PF ($2,500 due when I-140 approved and $2,500 when I-485s/GCs approved) |

33

# EXHIBIT C

## CALCULATION OF PERSONAL ADVANCES

The calculation below combines the immigration-related amounts shown as paid in Exhibit B, Plaintiff's personal knowledge that the final one-step professional fee was $5,000 for each of six family members, the separate $13,000.00 renovation contribution corroborated in part by Exhibit F, and $30,000.00 contributed to pay property taxes and preserve the Valley Drive residence.

| Matter | Calculation / basis | Amount |
|---|---|---|
| Consultation | Professional fee paid April 17, 2020 | $200.00 |
| H-1B / Form I-129 | Professional fees, filing fees, administrative charge, and convenience charges shown paid | $7,696.70 |
| Premium processing for I-129 | Professional fee, filing fee, and convenience charge shown paid | $1,980.00 |
| DS-260 immigrant-visa matters | Professional fees for Daoud and family shown paid | $5,000.00 |
| J-1 waiver for Rola | Professional fees, filing fee, administrative charge, and convenience charge shown paid | $2,866.40 |
| One-step I-140 / I-485 matters | Final professional fee of $5,000 for each of six family members ($30,000), plus $6,625 filing charges and $300 administrative charge | $36,925.00 |
| House-renovation loan/advances | Trim materials, finishing, stairway work, installation, and related residential renovation costs | $13,000.00 |
| Additional personal loans | Personal loans advanced directly to Daoud for his personal use and benefit | $30,000.00 |
| AGGREGATE TOTAL | Total personally loaned, paid, or advanced | $97,668.10 |

34

# EXHIBIT D

## NOVEMBER 23, 2020 CMU-MHC PROFESSIONAL SERVICES AGREEMENT

### PROFESSIONAL SERVICES AGREEMENT

This Professional Services Agreement (this "Agreement") is made and entered as of the 23 day of November, 2020, by and between the Central Michigan University Board of Trustees, for and on behalf of its College of Medicine, located at 1280 East Campus Drive, Suite 2405, Mount Pleasant, Michigan 48859 (the "University"), and Michigan Health Clinic, P.C., a Michigan professional corporation located at 4798 Wenmar Drive, Saginaw, Michigan 48604 (the "Consultant").

### RECITALS:

WHEREAS, Consultant's employee Dr. Ziad Daoud ("Dr. Daoud") has professional skills, knowledge, and experience to support the teaching, research, and service activities of the University; and,

WHEREAS, the University desires to retain Consultant and utilize the expertise of Dr. Daoud to provide such professional services to the University; and,

WHEREAS, Consultant is willing to provide the Services in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. **Scope of Services**. Consultant shall assign its employee, Dr. Ziad Daoud, to provide ten hours of professional teaching, research, and service activities (the "Services") but excluding any clinical services as determined and identified from time to time by the University during the term of this Agreement as directed by the University. Consultant shall be available to consult with the University and others as directed by the University concerning the Services. The University shall establish the goals to be achieved by the Services but not the details nor means by which such goals are accomplished.

2. **Compensation**. Assuming satisfactory performance, as compensation for the Services provided pursuant to this Agreement, the University shall pay Consultant annually Forty Six Thousand Ninety Nine Dollars ($46,091) in equal monthly installments effective August 1, 2020. The University shall issue such payment by or before the first of the month for each month that this Agreement is in effect. The University shall have no obligation to make any payment or reimbursement for any expenses or fees incurred in connection with the performance of Services pursuant to this Agreement except as agreed to in writing by the parties.

3. **Term and Termination**. This term of this Agreement shall begin effective August 1, 2020 and shall terminate on July 31, 2021. This Agreement may be renewed by mutual written agreement. Either party may terminate this Agreement by providing no less than thirty (30) days written notice to the other party. At the time of such notice of termination, Consultant shall complete all Services in progress as if such notice of termination had not been given. The

1

University shall have no liability to Consultant beyond payment pursuant to this Agreement for the Services rendered to the University prior to the effective date of such termination.

4. **Relationship of the Parties**. The status of Consultant shall be that of an independent contractor and not that of an employee, agent or other partner of the University. Consultant shall have no power or authority to act on behalf of the University or in its name or to bind the University, either directly or indirectly, in any manner nor shall Consultant make any representation otherwise to any person. Consultant is retained solely for the purpose of providing the Services to the University. Consultant expressly assumes all tax liabilities associated with the compensation paid pursuant to this Agreement. Nothing in this Agreement shall be understood or construed to create or imply any relationship between the parties in the nature of any joint venture, employer/employee, principal/agent or partnership. Consultant shall not be considered as having an employee status or as being entitled to any benefits available to University employees, including but not limited to any pension or benefit plan, worker's compensation or unemployment compensation. Consultant acknowledges that Consultant is not engaged by the University in any other capacity and that Consultant shall not hold any other position with the University during the term of this Agreement nor shall Consultant file or apply for any unemployment benefit or similar payment with any federal, state or local agency.
If this independent contractor relationship is determined by tax authorities to constitute an employment relationship, Consultant hereby waives, for the period prior to the date such determination becomes final, any and all claims to coverage under all University benefit plans.

5. **Representations and Warranties of Consultant**. Consultant represents, warrants and covenants to the University that: (i) Consultant through its employees possesses the requisite training, knowledge, skills, experience and expertise to provide the Services and shall provide the Services in accordance with the standards of care, skill and diligence consistent with recognized and prudent industry practices, all applicable laws and regulations, and procedures applicable to the Services and the degree of knowledge, skill and judgment normally exercised by professionals with respect to services of the same or similar nature; (ii) Consultant has the right, power and capacity and is duly authorized and empowered to execute, deliver and perform this Agreement; (iii) this Agreement, upon execution thereof by the person representing Consultant below, will be the legal, valid and binding agreement of Consultant, enforceable against Consultant in accordance with its terms and applicable law; and (iv) Consultant's performance of Services pursuant to this Agreement does not violate any existing agreement or obligation between Consultant and a third party.

6. **Confidential Information**. Consultant acknowledges that in connection with this Agreement and the Services provided by Consultant under this Agreement, the University may provide, and Consultant may acquire and make use of, certain confidential information of the University relating to the provision of the Services which may include, but is not limited to, Work Product (as defined in Section 7), this Agreement, student and student-related information, reports, methods of operation, trade secrets, training materials, policies, protocols, and procedures (administrative, research, and clinical), budgeting, staffing needs, databases, marketing research, equipment capabilities, fee schedules, and other proprietary, business, financial and other information connected with or related to the University that is not generally known to the public (collectively, "Confidential Information"). Consultant shall not use or access such Confidential

2

Information except in connection with the performance of the Services, or divulge the Confidential Information to any third party, unless the University consents in writing to such use or divulgence or such disclosure is required by law or required to perform the Services of this Agreement. In the event Consultant receives a request or demand from a third party for the disclosure of Confidential Information, Consultant shall promptly (within two (2) business days after receipt of such request or demand) provide written notice to the University of such request or demand, including a copy of any written document of such request or demand. Consultant agrees to protect and safeguard from and against unauthorized access, use or disclosure the Confidential Information of the University in the same manner that it protects the confidentiality of its own proprietary and confidential information of like kind (but in no event using less than reasonable care). Upon expiration or termination of this Agreement, Consultant shall not take nor retain, without prior written consent from the University, any Confidential Information or copies thereof in any form or medium of any kind. Upon the expiration or termination of this Agreement or otherwise upon the request of the University, all Confidential Information received by Consultant shall be promptly returned to the University or, upon request of the University, destroyed with such destruction confirmed in writing by Consultant in a form reasonably satisfactory to University. Without limiting other possible remedies for the breach of these covenants relating to Confidential Information, the parties agree that injunctive or other equitable relief shall be available to enforce any and all of these covenants, such relief to be without the necessity of posting a bond, cash or otherwise.

7. **Intellectual Property**. Consultant shall provide the Services for the exclusive benefit of the University. Except as provided below, all items created or developed in, or resulting from, the course of performance by Consultant of its various obligations under this Agreement, including, without limitation all (i) plans; (ii) materials; (iii) reports and results; (iv) documents; (v) graphic elements; aesthetic qualities, "look and feel" of any deliverable and all other unique, novel and/or customized parts and aspects of any and all deliverables not generally used or applied to similar products; (vi) computer software, in source code, object code and/or script form, and all related user, programmer and technical documentation, as well as all modifications, and enhancements of any of the foregoing; (vii) text, photos, recordings or other materials of any kind or nature; and (viii) all elements of the deliverables created or developed by or on behalf of Consultant (collectively, "Work Product") have been or will have been specially ordered or commissioned by the University and, accordingly each is and will be a "work for hire" (as that term is defined in the Copyright Act of 1976) for the University, effective as of the moment each such item is fixed in a tangible medium, whether such item is complete.

In addition, Consultant hereby transfers and assigns to the University all of its rights, titles and interests in the Work Product, including, without limitation, all patents, trade secrets, copyrights and other propriety rights of Consultant. Notwithstanding any other provision of the law that may cause rights to such Work Product to vest initially in Consultant, all right, title and interest, including, without limitation, all copyrights in and to any and all copyrightable works, resulting from or developed in connection with any such Services shall be, or shall become owned by the University and the same are hereby transferred in their entirety to University. Consultant shall have no right, title, or interest in any Work Product and shall not use, license or otherwise transfer or distribute any such Work Product without the prior written consent of the University. Upon expiration or termination of this Agreement, Consultant shall not take or retain, without

3

prior written consent of the University, any Work Product or copies thereof in any form or medium of any kind.

Consultant will (a) execute any and all such documents as the University may reasonably request from time to time to vest in the University all of the rights granted or transferred by Consultant under this Agreement and (b) take all reasonable steps to have each of those persons who has or will have participated in the development of the deliverables for, or on behalf of, Consultant execute any and all such agreements, applications, assignments, instruments and/or other documents required by the University for such purposes and, further, perform or cause to be performed such other lawful acts, as the University may deem necessary or desirable to evidence full and exclusive title to any and all Work Product. Furthermore, Consultant shall assist and cooperate with the University and its representatives in any controversy or legal proceedings relating to such Work Product. Consultant shall not acquire any rights of any kind whatsoever including, but not limited to, publication rights, patent, copyright, trademark, or service mark rights, ownership rights, or promotional rights with respect to any inventions, discoveries, technology, or scientific or medical findings, whether patentable or non-patentable, in the Work Product and/or resulting from the Services provided by Consultant. Consultant shall promptly disclose only to the University or its designee any invention, discovery, technology, or scientific or medical findings, whether patentable or non-patentable, in the Work Product and/or resulting from the Services provided by Consultant.

Consultant shall not use the name, trademarks, logos, copyrights or service marks of the University without the prior written consent of the University. The performance by Consultant of the Services pursuant to this Agreement will not infringe any copyright, patent, trade secret, or other proprietary right held by any third party. Consultant will create or develop the Work Product only through the services of employees and/or independent contractors of Consultant who have executed written agreements that (a) contain appropriate confidentiality and ownership provisions consistent with the terms of this Agreement and (b) assign to Consultant all rights, titles and interests of such personnel in the Work Product, including without limitation, patents, trade secrets, copyrights and other propriety rights of such personnel.

8. **Conflict of Interest**. During the term of this Agreement Consultant shall avoid any conflict of interest, including but not limited to any situations in which financial or other personal considerations directly or significantly affect, or have the appearance of directly or significantly affecting the professional duties of Consultant in performance of this Agreement.

9. **Compliance with Laws; Indemnification**. Consultant shall comply with all applicable federal, state and local laws in connection with the performance by Consultant of obligations of Consultant under this Agreement. Consultant agrees to release the University from any claims, other than breach of this Agreement, arising under or relating to this Agreement. Consultant hereby agrees to defend, indemnify and hold harmless the University and its trustees, directors, officers, employees and agents (each a "University Indemnified Party") from and against any claims, demands, suits, settlements, damages, losses, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees) (each a "Claim") paid or incurred by, or asserted against any University Indemnified Party relating to or arising out of or in connection with (i) the breach of any of this Agreement by Consultant; or (ii) the negligence or willful misconduct of

4

Consultant or any of its officers, directors, trustees, employees, representatives and/or agents except to the extent such Claim relates to, arises out of or in connection with the negligence of the University.

To the extent permitted by law, the University hereby agrees to defend, indemnify and hold harmless Consultant and its trustees, directors, officers, employees and agents (each an "Consultant Indemnified Party") from and against any claims, demands, suits, settlements, damages, losses, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees) (each a "Claim") paid or incurred by, or asserted against any Consultant Indemnified Party relating to or arising out of or in connection with (i) the breach of any of this Agreement by the University; or (ii) the negligence or willful misconduct of the University or any of its officers, directors, trustees, employees, representatives and/or agents except to the extent such Claim relates to, arises out of or in connection with the negligence of the Consultant.

10. **Notices**. All notices, demands and other communications required or permitted hereunder or in connection herewith shall be in writing and delivered in person or sent electronically, by facsimile, nationally recognized overnight courier or registered or certified mail, return receipt requested and postage prepaid to the applicable party at its address set forth below or at such other address as any party hereto may designate as its address for communications under this Agreement by notice so given. Such communications shall be deemed effective on the (i) day on which delivered or sent if delivered in person, electronically (with confirmatory response electronically sent), or by facsimile (with answered back confirmation received); (ii) first (1st) business day after the day on which sent, if sent by a nationally recognized overnight courier; or (iii) third (3rd) business day after the day on which mailed, if sent by registered or certified mail to:

If to the University:

Dr. Manuel R. Rupe
Senior Associate Dean for Legal Affairs
Central Michigan University College of Medicine
1280 East Campus Drive
Mount Pleasant, MI 48859

If to Consultant:

Dr. David Stockman
Michigan Health Clinics, P.C.
4798 Wenmar Drive
Saginaw, MI 48604

11. **Captions; Entire Agreement; Amendments**. The caption headings are furnished for the convenience and reference of the parties and do not define, limit, extend or describe the scope of this Agreement or any provision in this Agreement. This Agreement, exhibits and other documents incorporated by reference in this Agreement set forth the entire understanding between the parties hereto regarding the subject matter hereof and supersedes all prior and

5

contemporaneous negotiations, agreement and undertakings between the parties with respect to the subject matter. In the event of any inconsistency or conflict between the terms hereof and any exhibit or other document incorporated by reference into this Agreement, the terms hereof shall govern and control. This Agreement may not be amended or modified except by an instrument in writing signed by both parties.

12. **No Waiver**. Neither the failure nor delay by either party to exercise any right, remedy, power or privilege under the Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege, nor shall any waiver with respect to any occurrence be construed as a waiver with respect to any other occurrence. No waiver of any right, remedy, power or privilege under this Agreement will be effective unless in writing signed by the party to be charged thereby.

13. **Assignment; Binding Effect**. Consultant shall not assign or transfer any rights or obligations of Consultant under this Agreement without the prior written consent of the University. This Agreement shall be binding on heirs, successors in interest and permitted assigns of the parties. This Agreement is being entered solely for the benefit of the parties hereto and nothing in this Agreement shall confer nor be interpreted as having conferred any benefit to any third party.

14. **Governing Law**. The validity, construction, interpretation and all other matters relating to this Agreement shall be governed by and interpreted in accordance with the laws of the State of Michigan, without regard to its conflict of law principles. In the event of any action or proceeding to enforce any term of this Agreement, the parties shall submit to the exclusive venue of a court of competent jurisdiction in the State of Michigan.

15. **Counterparts**. This Agreement may be signed in two or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement.

16. **Insurance/Authorization**. Consultant shall carry adequate liability, property, workers' compensation, umbrella and other insurance of a kind and in an amount generally carried by persons engaged in the same or a similar kind of business similarly situated. Upon request, Consultant shall supply to the University a certificate(s) of insurance evidencing the same, where required. Consultant hereby represents, warrants and covenants to University that it has and/or will have and maintain all necessary permits, license, approvals and other authorizations applicable to the performance of its obligations contemplated under this Agreement.

17. **Survival; Severability**. The provisions of Sections 4, 6, 7, 9, 14 and 17 shall survive any cancellation or termination of this Agreement. If any provision of this Agreement is found invalid or unenforceable by a court of competent jurisdiction, then such provision shall be deemed stricken herefrom and the remainder of this Agreement shall remain at all times in full force and effect and such invalid or enforceable provision shall, to the extent legally permitted, be replaced by the valid and enforceable provision that is closest to the parties' intent underlying the invalid or unenforceable provision.

[The remainder of this page is blank and the signature page follows.]

6

IN WITNESS WHEREOF, the parties hereto have caused this Professional Services Agreement to be executed by their respective duly authorized representatives as of the day and year first above written.

THE UNIVERSITY:

By:_____
       George E. Kikano, M.D.
Its:   Vice President for Health Affairs
       Dean, College of Medicine

CONSULTANT:

By:_____
       David Stockman, M.D.
Its:   President

7



**Michigan Health Clinics**
email **invoices@mihealthclinic.com**
3925 Fortune Boulevard
Saginaw, Michigan 48603
☎ || 989.341.5078
🖨 || 989.341.5073

## INVOICE

**BILL TO**

CENTRAL MICHIGAN
UNIVERSITY
CMED 2405
Attn: Kim Densl-Wheeler
1280 S. East Campus Dr.
Mount Pleasant, MI 48859
USA

**INVOICE #** 2006551
**DATE** 08/23/2023
**DUE DATE** 08/23/2023
**TERMS** Due on receipt

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|------|----------|-------------|-----|------|--------|
| 07/01/2023 | FTE CONTRIBUTION | DAOUD FTE - JUL 2023 | 1 | 4,028.42 | 4,028.42 |
| 08/01/2023 | FTE CONTRIBUTION | DAOUD FTE - AUG 2023 | 1 | 4,028.42 | 4,028.42 |
| 09/01/2023 | FTE CONTRIBUTION | DAOUD FTE - SEP 2023 | 1 | 4,028.42 | 4,028.42 |

PLEASE REMIT PAYMENT TO
ATTN: BRIAN HART/MAGDALENA PEREZ
MICHIGAN HEALTH CLINICS, SUITE 6
3925 FORTUNE BOULEVARD
SAGINAW, MI 48603

All payments are due 30 days before quarter start
date.

**BALANCE DUE**  **$12,085.26**

7/25/26, 7:02 PM                                                    Gmail - Ziad job

 Gmail                                    David Stockman <dstockman@gmail.com>

## Ziad job
1 message

**Nathan Moeller** <nnmoeller@aol.com>                    Mon, Jan 25, 2021 at 6:19 AM
To: Ziad Daoud <zdaoud@mihealthclinic.com>, David Stockman <dstockman@gmail.com>

Good morning Ziad and Dave
The cost for Ziad job up to date is
$5,600 trim material

$ 4,100 putting a finish on all the trim

$1,200  installing 2 stairways treads and risers
_____

$10,900 up to date

I don't know what the cost is on the INSTALL of the base and case is yet
And I am making calls this morning on if I can get my trim guys in to install the trim

Let me know how you want this invoiced


Thanks guys
Nate

Sent from my iPhone

# EXHIBIT G

## CMU SESSIONS AND CONTINUING SUMMER/ACADEMIC WORK

 Michigan Health Clinics <doctor@mihealthclinic.com>

**FW: CMU sessions**
1 message

**Amy Earl** <aearl@fwf-law.com>                                    Tue, Oct 3, 2023 at 8:40 AM
To: "doctor@mihealthclinic.com" <doctor@mihealthclinic.com>

https://secure.lawpay.com/pages/fwf-law/operating

Credit card payment link.



**SEND LARGE FILES BY CLICKING HERE.**

**From:** Steve Feldman <sfeldman@fwf-law.com>
**Sent:** Monday, October 2, 2023 6:25 PM
**To:** Amy Earl <aearl@fwf-law.com>
**Subject:** Fwd: CMU sessions

Sent from my iPhone

Begin forwarded message:

> **From:** Michigan Health Clinics <doctor@mihealthclinic.com>
> **Date:** October 2, 2023 at 5:51:50 PM EDT
> **To:** Steve Feldman <sfeldman@fwf-law.com>
> **Cc:** Mark Merlanti <mmerlanti@fwf-law.com>
> **Subject: Re: CMU sessions**

> can you send me a payment link

On Mon, Oct 2, 2023 at 2:02 PM Steve Feldman <sfeldman@fwf-law.com> wrote:

David

I'll be happy to work with you but you didn't make any promised payments in September. In order for us to continue, I need a $20,000 payment by Wednesday. Can't just keep going on promises

Steve

**Please note that our firm name has changed to Finkel Whitefield Feldman and with that change I have a new email address. Emails sent to my previous address will forward to this new address, but please update your contact information for me to ensure ongoing communication.  Thank you.**

**SEND LARGE FILES BY CLICKING HERE.**

DISCLAIMER/CONFIDENTIALITY:  The communication, along with any documents, files or attachments, is intended only for the use of the addressee and may contain legally privileged and confidential information.  Any document attached is a legal document and should not be changed or altered without the knowledge and approval of legal counsel.  The sender takes no responsibility for any alterations, additions, revisions or deletions to any such document.  Due to software and printer variations, documents printed at the recipient's location may vary from the original printed document.  If the reader is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the above address via the U.S. Postal Service. We will reimburse you for postage. Thank you.

**From:** David L. Stockman, MD <david@mihealthclinic.com>
**Sent:** Monday, October 2, 2023 1:25 PM
**To:** Manuel R Rupe <rupe1mr@cmich.edu>; Steve Feldman <sfeldman@fwf-law.com>; George E Kikano <kikan1ge@cmich.edu>
**Subject:** Fwd: CMU sessions

Hi,

So I wanted to circle back. These are Dr. Daoud's scheduled classes during this time.

---------- Forwarded message ---------
From: **David L. Stockman** <david@mihealthclinic.com>
Date: Mon, Sep 18, 2023 at 3:27 PM
Subject: Re: CMU sessions
To: Ziad Daoud <zdaoud@mihealthclinic.com>

I understand but you are still working for them and they haven't paid since June.

> On Sep 18, 2023, at 1:05 PM, <zdaoud@mihealthclinic.com> <zdaoud@mihealthclinic.com> wrote:
>
> Not really, except if I went some time to check on experiments or for meetings, probably couple time on half day basis… but I did not find any trips on my calendar and do not remember other than what I sent… Teaching activities cease during summer
>
> **From:** David L. Stockman <david@mihealthclinic.com>
> **Sent:** Monday, September 18, 2023 1:02 PM
> **To:** Ziad Daoud <zdaoud@mihealthclinic.com>
> **Subject:** Re: CMU sessions
>
> We haven't had to be there over the summer?
>
>> On Sep 18, 2023, at 10:42 AM, <zdaoud@mihealthclinic.com> <zdaoud@mihealthclinic.com> wrote:
>>
>> I went back to January 2023:
>>
>> January: No sessions
>>
>> February 09: research meeting with students
>>
>> March 21: 12:00 to 13:00, and  14:00 to15:00
>>
>> March 23: 13:00 to 15:00
>>
>> March 30: 13:00 to 15:00
>>
>> April 6: 15:00 to 17:00
>>
>> May 9: 13:00 to 14:00
>>
>> May 15: 8:00 to 10:00
>>
>> September 8: research with Students

**From:** David L. Stockman <david@mihealthclinic.com>
**Sent:** Monday, September 18, 2023 10:05 AM
**To:** Ziad Daoud <zdaoud@mihealthclinic.com>
**Subject:** Re: CMU sessions

I need the ones up to this point. As I mentioned. CMU has not paid.

On Sep 18, 2023, at 9:20 AM, zdaoud@mihealthclinic.com
wrote:

Hi, these are the official CMU sessions for this year.
For 2024, will send as soon as I get them:

09-29-2023: 10:00-12:00

10-11-2023: 13:00- 15:00

10-13-2023: 14:00- 16.30

11-6-2023: 13:00- 14:00

11-22-2023: 14:30- 16:30

12-13-2023: 13:00- 15:00

In addition, every other Wednesday, I meet with
students in the lab for research work and follow up.

Regards,

**Ziad Daoud, PhD. SM(ASCP$^{i}$)$^{CM}$**

**Professor | Clinical Microbiology**

Director of Clinical Microbiology and Infection Prevention

Michigan Health Clinic, Saginaw

CMED | Central Michigan University |

daoud1z@cmich.edu | www.cmich.edu

**Regards,**

**David**

**David L. Stockman**

**MICHIGAN HEALTH CLINICS**

**email || david@mihealthclinic.com**

3925 Fortune Blvd || Saginaw || Michigan || 48603

**Office: 989.341.5078 || Fax: 989.341.5073**



This email may contain legally privileged and/or confidential information.

If you are not the intended recipient, or the employee or agent responsible for delivery of this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this email is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this email from your computer. Your cooperation is appreciated.

**2 attachments**

Stephen M. Feldman, Esq.
Finkel Whitefield Feldman

(248) 855-6500 Work
(248) 855-6501 Fax
sfeldman@fwf-law.com

32300 Northwestern Hwy, Ste 200
Farmington Hills, MI   48334

**image001.png**
50K

Stephen M. Feldman, Esq.
Finkel Whitefield Feldman

(248) 855-6500 Work
(248) 855-6501 Fax
sfeldman@fwf-law.com

32300 Northwestern Hwy, Ste 200
Farmington Hills, MI   48334

**image001.png**
50K

# EXHIBIT H

## CMU RECEIPT, RESPONSE, AND DISPUTE CONCERNING DAOUD SERVICES

## AND INVOICE

 **mi health** clinic

Michigan Health Clinics <doctor@mihealthclinic.com>

---

## RE: [External] RE: CMU College of Medicine Matter
1 message

**Victor Torres** <vtorres@vtorreslaw.net>                    Sun, Oct 29, 2023 at 11:41 AM
To: David Stockman <dstockma4@icloud.com>, "David L. Stockman, MD" <david@mihealthclinic.com>

10-29-23

Privileged and Confidential

Dave, the email below is a main reason that I hammer on getting and reviewing underlying documents before (and after) filing of complaints and shows why I asked you how you knew that Daoud is working for MyMichigan Health and CMU. It looks like CMU is denying that Daoud is working for them. On the other hand, I included the attached excerpt from Daoud's Linked-In posting on-line as exhibit D to the verified complaint because Linked-In shows that Daoud is working for MyMichigan Health as "Microbiology Director" and for CMU as an "Professor". We need to ferret out the truth, and there are a couple of ways to get there.

If you want, call me tomorrow to discuss next steps. Of course, at a minimum I would need to revise the verified complaint allegations and other documents related to CMU unless and until we confirm Daoud's employment status with CMU. Best Regards,

Victor J. Torres

**Torres Law, PLLC**

31350 Telegraph Road, Suite 202

Bingham Farms, Michigan  48025

**(734) 358-8000**

fax: (734) 219-3439

vtorres@vtorreslaw.net

---

**From:** David Stockman <dstockma4@icloud.com>
**Sent:** Saturday, October 28, 2023 5:45 PM
**To:** Victor Torres <vtorres@vtorreslaw.net>
**Subject:** Fwd: [External] RE: CMU College of Medicine Matter

49

26-20982-dob    Doc 98    Filed 07/27/26    Entered 07/27/26 09:51:47    Page 52 of 64

Sent from my iPhone

Begin forwarded message:

**From:** Steve Feldman <sfeldman@fwf-law.com>
**Date:** October 27, 2023 at 10:26:45 AM EDT
**To:** David Stockman <dstockma4@icloud.com>
**Subject: FW: [External] RE: CMU College of Medicine Matter**

See below

**Please note that our firm name has changed to Finkel Whitefield Feldman and with that change I have a new email address. Emails sent to my previous address will forward to this new address, but please update your contact information for me to ensure ongoing communication. Thank you.**



**Stephen M. Feldman, Esq.**
**Finkel Whitefield Feldman**

(248) 855-6500 Work
(248) 855-6501 Fax
sfeldman@fwf-law.com

32300 Northwestern Hwy, Ste 200
Farmington Hills, MI 48334

**SEND LARGE FILES BY CLICKING HERE.**

DISCLAIMER/CONFIDENTIALITY: The communication, along with any documents, files or attachments, is intended only for the use of the addressee and may contain legally privileged and confidential information. Any document attached is a legal document and should not be changed or altered without the knowledge and approval of legal counsel. The sender takes no responsibility for any alterations, additions, revisions or deletions to any such document. Due to software and printer variations, documents printed at the recipient's location may vary from the original printed document. If the reader is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the above address via the U.S. Postal Service. We will reimburse you for postage. Thank you.

**From:** Rupe, Manuel R <rupe1mr@cmich.edu>
**Sent:** Friday, October 27, 2023 9:58 AM
**To:** Steve Feldman <sfeldman@fwf-law.com>
**Subject: RE: [External] RE: CMU College of Medicine Matter**

Hi Steve, I hope this email finds you well. The CMU College of Medicine has reviewed its information and although Dr. Daoud has not participated in any teaching activities this academic year, he did present as part of our first year student orientation on August 10, 2023 for 1.5 hours. Consistent with CMED's compensation practices, CMED would like to issue payment to Dr. Daoud's employer as of that date in the amount of $600.00. If Dr. Dauod was employed by Michigan Health Clinics on that date, please have an invoice issued for that date of service for the 1.5 hours at $600.00 total. Please note that CMED's records do not show any dates for teaching activities through 2023 for this academic year. Thanks, Manuel

**Manuel R. Rupe, JD, PhD**

✉ manuel.rupe@cmich.edu

🖰: Visit us online!

**Senior Associate Dean of Legal Affairs | CMU College of Medicine**

1280 East Campus Dr., Suite 2405 | Mt. Pleasant MI 48859

☎: 989-774-2544 | 🖨: 989-774-1215

**Central Values: Integrity | Respect | Compassion | Inclusiveness | Social Responsibility | Excellence | Innovation**

Please consider the environment before printing this email.

---

**From:** Steve Feldman <sfeldman@fwf-law.com>
**Sent:** Friday, October 13, 2023 1:22 PM
**To:** Rupe, Manuel R <rupe1mr@cmich.edu>
**Subject:** [External] RE: CMU College of Medicine Matter

I'll reach out next week to get accurate information!

Thanks

Steve

**Please note that our firm name has changed to Finkel Whitefield Feldman and with that change I have a new email address. Emails sent to my previous address will forward to this new address, but please update your contact information for me to ensure ongoing communication. Thank you.**

**<image002.png>**

**SEND LARGE FILES BY CLICKING HERE.**

DISCLAIMER/CONFIDENTIALITY: The communication, along with any documents, files or attachments, is intended only for the use of the addressee and may contain legally privileged and confidential information. Any document attached is a legal document and should not be changed or altered without the knowledge and approval of legal counsel. The sender takes no responsibility for any alterations, additions, revisions or deletions to any such document. Due to software and printer variations, documents printed at the recipient's location may vary from the original printed document. If the reader is not the intended recipient, you are hereby notified that any dissemination, distribution or duplication of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone collect and return the original message to us at the above address via the U.S. Postal Service. We will reimburse you for postage. Thank you.

**From:** Rupe, Manuel R <rupe1mr@cmich.edu>
**Sent:** Tuesday, October 10, 2023 1:36 PM
**To:** Steve Feldman <sfeldman@fwf-law.com>; Michael Cox <mc@mikecoxlaw.com>
**Subject:** CMU College of Medicine Matter

Steve, I hope this email finds you well. Please see the first attached email related to this matter which I sent you on September 27. Additionally, Dr. Stockman sent an email (second attachment) purporting to list Dr. Dauod's teaching responsibilities for the CMU College of Medicine, but, for example, Dr. Daoud did not teach on September 29, 2023, according to CMED records, and he is not performing ongoing professional responsibilities for CMED. Therefore, Dr. Stockman's information is incorrect. Additionally, CMED does not have Dr. Daoud listed as teaching for the other dates Dr. Daoud provided in the second attachment, and CMED does not have a contractual relationship with Michigan Health Clinic, P.C. CMED also does not have a contractual relationship with Dr. Dauod or MyMichigan Health related to or involving Dr. Dauod. Perhaps you and I could set up a time to discuss this matter to address any incorrect information.

Sincerely,

**Manuel R. Rupe, JD, PhD**

✉ manuel.rupe@cmich.edu

🖱: Visit us online!

**Senior Associate Dean of Legal Affairs | CMU College of Medicine**

1280 East Campus Dr., Suite 2405 | Mt. Pleasant MI 48859

☎: 989-774-2544 | 🖨: 989-774-1215

**Central Values:** **Integrity | Respect | Compassion | Inclusiveness | Social Responsibility | Excellence | Innovation**

<image001.jpg>

Please consider the environment before printing this email.

**From:** David L. Stockman, MD <david@mihealthclinic.com>
**Sent:** Tuesday, October 10, 2023 11:41 AM
**To:** Rupe, Manuel R <rupe1mr@cmich.edu>

**Cc:** Steve Feldman <sfeldman@fwf-law.com>; Michael Cox <mc@mikecoxlaw.com>
**Subject:** [External] Fwd: INVOICE FOR DAOUD FTE CONTRIBUTION

Hi Manuel,

I wanted to have you make a connection with Steve regarding the past due payment and hopefully any resolution regarding the issue with Dr. Daoud.

Again, we have the past due payment despite being out of contract as Dr. Daoud continued to work for CMU. Also, Dr. Daoud did mention to us that Dr. Kikano wanted to pay him outside of his contract with us or pay potentially MidMichigan both of which are against the restrictive covenant.

I am asking that the invoice be paid or we will seek more damages and so I've included our litigation counsel. I would prefer that we don't play coy and dance around the fact that he was working for CMU during this time period.

Please let me know your intention.

Regards,

David

---------- Forwarded message ---------
From: **MIHEALTH Invoicing** <invoices@mihealthclinic.com>
Date: Thu, Aug 24, 2023 at 8:00 AM
Subject: INVOICE FOR DAOUD FTE CONTRIBUTION
To: <kikan1ge@cmich.edu>, <CMEDFinance@cmich.edu>

Hi,

Please see attached invoice for services.

**Regards,**

**Jennifer**

**Jennifer Arizo**

*Director of Finance*

**MICHIGAN HEALTH CLINICS**

**email ||** **jenniferarizo@mihealthclinic.com**

3925 Fortune Boulevard || Saginaw || Michigan || 48603

**Office: 989.341.5078 || Fax: 989.341.5073**

Regards,

David

David L. Stockman

MICHIGAN HEALTH CLINICS

email || david@mihealthclinic.com

3925 Fortune Blvd || Saginaw || Michigan || 48603

Office: 989.341.5078 || Fax: 989.341.5073

This email may contain legally privileged and/or confidential information.

If you are not the intended recipient, or the employee or agent responsible for delivery of this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this email is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this email from your computer. Your cooperation is appreciated.

Exhibit D - 10-23-23 Linked In Ziad Daoud, Ph.D.pdf
2040K

# EXHIBIT I

## OCTOBER 23, 2023 LINKEDIN PROFILE - MYMICHIGAN AND CMU ROLES





**Ambassador**
American Society for Microbiology
Jan 2018 - Present · 5 yrs 10 mos
Lebanon

**Director of clinical Microbiology and infection prevention**
COVENANT PATHOLOGY ASSOCIATES
Jun 2020 - Oct 2023 · 3 yrs 5 mos
Michigan, United States

**University of Balamand**
20 yrs 10 mos

**Professor of clinical Microbiology and Chair of biomedical science department, faculty of medicine**
Jan 2000 - Jul 2020 · 20 yrs 7 mos
Lebanon

**Director of the Medical Laboratory Sciences Program**
Jan 2005 - Feb 2010 · 5 yrs 2 mos
Beirut District, Lebanon

**Coordinator of students' co-curricular activities (Off campus OSA)**
Oct 1999 - Oct 2005 · 6 yrs 1 mo
Beirut District, Lebanon

Show all 4 experiences →

Show all 13 experiences →

## Education

**Tufts University School of Medicine**
Antimicrobial stewardship, Medical Microbiology and Bacteriology
2012 - 2013

**Universidad Complutense de Madrid**
PhD, Clinical microbiology
1991 - 1996
Grade: Doctor

Show all 4 education →

## Skills

**Epidemiology**
Endorsed by 7 colleagues at University of Balamand

20 endorsements

**Public Health**
Endorsed by Talal A. Kayyal who is highly skilled at this

Endorsed by 12 colleagues at University of Balamand

34 endorsements

Show all 17 skills →

## Interests

# EXHIBIT J

## SEPTEMBER 15, 2023 KIKANO EMAIL REGARDING JUNE 30, 2023 EXPIRATION



Michigan Health Clinics <doctor@mihealthclinic.com>

## Re: [External] Daoud Extension
1 message

**Kikano, George E** <kikan1ge@cmich.edu>         Fri, Sep 15, 2023 at 4:06 PM
To: "David L. Stockman" <david@mihealthclinic.com>
Cc: Steve Feldman <sfeldman@fwf-law.com>, "Rupe, Manuel R" <rupe1mr@cmich.edu>

David

Thanks for the email. In checking with Manuel, the professional service agreement with MI health clinic expired at the end of June 2023 and It doesn't have an extension clause. Best. GEK

**From:** David L. Stockman <david@mihealthclinic.com>
**Date:** Tuesday, September 12, 2023 at 6:34 PM
**To:** Kikano, George E <kikan1ge@cmich.edu>, Rupe, Manuel R <rupe1mr@cmich.edu>
**Cc:** Steve Feldman <sfeldman@fwf-law.com>
**Subject:** [External] Daoud Extension

Hi Dr. Kikano,

I hope all is well with you and you are beginning another successful school year. I know we are late as Dr. Daoud has already started working, he said that you would like to renew the contract for the current year. His burden based off his ask is to raise his salary again, he is asking for compensation to raise his total encumbrance to $270,000. This would raise your yearly contribution to $54,000.

Regards,

**David**

**David L. Stockman**
**MICHIGAN HEALTH CLINICS**
**email II david@mihealthclinic.com**
**3925 Fortune Boulevard || Saginaw || Michigan || 48603**
**Cellular: 989.341.3017 II Office: 989.341.5078 II Fax: 989.341.5073**



# EXHIBIT K

## PROPERTY HISTORY FOR 3113 VALLEY DRIVE - REPORTED $399,000

## PURCHASE AND $1,000,000 2024 SALE



**3113 Valley Dr, Midland, MI 48640**
- Est. $1,068,476

4 bed • 3.5 bath • 5,868 sqft • 1.85 acre lot

Cont.

Property details    Home value    Property history    Home improvements    Neighborhood & schools    Environmental risk

### Property history

| $1,000,000 | $18,686 | 3 sales | 40 years old |
|---|---|---|---|
| Last sold in 2024 | 2025 taxes | Since 2016 | Built in 1986 |

**Price history**

**2024**

| May 29, 2024 | Sold | $1,000,000 | $170/sqft |
| 44 days after listed | Public Record | -9.09% | |
| May 29, 2024 | Listing removed | - | - |
| | Midland | | |
| Apr 15, 2024 | Listed | $1,100,000 | $187/sqft |
| | Midland | +175.69% | |

**2020**

| Dec 1, 2020 | Sold | $399,000 | $68/sqft |
| | Public Record | -$500 | |

60

**EXHIBIT L**

**PROPERTY RECORD SHOWING JUNE 21, 2024 WARRANTY-DEED**

**TRANSACTION AND REPORTED $760,000 SALE PRICE**

## Sales Information

### ▾ Sale Date: 06-21-2024

Sale Price: 760000
Instrument: WD
Grantor: STAFFORD, DAVID & PAULA H&W
Grantee: DAOUD, ZIAD
Terms of Sale: 03-ARM'S LENGTH
Liber/Page: 1673/410

**EXHIBIT M**

**PROPERTY RECORD IDENTIFYING 2138 N. CELENA DRIVE AS OWNED BY**

**ZIAD DAOUD AND ROLA A. MASSIH**

# Property Details: 090-161-500-170-00

## Property Address

2138 N CELENA DR

MIDLAND, MI, 48642

## Owner Address

| DAOUD, ZIAD & MASSIH, ROLA A | Unit: |
|---|---|
| -- | Unit Name: |
| 2138 N CELENA DR | |
| MIDLAND, MI 48642 | |

## General Information for 2026 Tax Year