**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION - BAY CITY**

In re:
DAVID LEWI-EMMANUEL STOCKMAN,
Debtor.
_______________________________________/

Bankruptcy Case No. 26-20982-dob
Chapter 7
Hon. Daniel S. Opperman

DAVID L. STOCKMAN, M.D.,
Plaintiff,

v.

COLE WATERMAN a/k/a COLE WATERS;
STEPHAN M. GAUS;
MARCUS ATKINS a/k/a LUKE SOLO and a/k/a TODD ATKINS;
SARAH ATKINS;
BRIANN D. SUMMERSETT a/k/a BRI SUMMERSETT;
ROSHAN MAHABIR, M.D. a/k/a AMERICAN BUSINESS;
SHANE STARR; and
RUSSELL L. BUSH,
Defendants.
_______________________________________/

Adversary Proceeding No. __________ (to be assigned)

Removed from Saginaw County Circuit Court
Case No. 26-001695-NO
Hon. Julie A. Gafkay

**NOTICE OF REMOVAL OF STATE-COURT CIVIL-STALKING ACTION**

**28 U.S.C. §§ 1334 AND 1452(a); FED. R. BANKR. P. 9027**

David L. Stockman, M.D. ("Stockman"), the Chapter 7 Debtor and the named Plaintiff in Saginaw County Circuit Court Case No. 26-001695-NO, appearing pro se solely for himself, files this Notice of Removal under 28 U.S.C. § 1452(a), Federal Rule of Bankruptcy Procedure 9027, and E.D. Mich. LR 83.50(d)(1). Section 1452(a), unlike the ordinary removal statute, authorizes "a party" to remove a claim or cause of action within bankruptcy jurisdiction. Stockman does not purport by this Notice to prosecute any cause of action that belongs exclusively to the Chapter 7 estate without authority from Chapter 7 Trustee Samuel D. Sweet.

## I. STATE-COURT ACTION

1. The removed action is David L. Stockman, M.D. v. Cole Waterman, et al., Saginaw County Circuit Court Case No. 26-001695-NO, assigned to the Honorable Julie A. Gafkay.

2. The Verified Complaint and Jury Demand was filed on July 27, 2026. The complaint asserts one cause of action under MCL 600.2954 based on alleged conduct prohibited by MCL 750.411h and seeks damages and narrowly tailored injunctive relief.

3. The complaint names Cole Waterman a/k/a Cole Waters; Stephan M. Gaus; Marcus Atkins a/k/a Luke Solo and a/k/a Todd Atkins; Sarah Atkins; Briann D. Summersett a/k/a Bri Summersett; Roshan Mahabir, M.D. a/k/a American Business; Shane Starr; and Russell L. Bush as Defendants.

4. The Saginaw County docket reflects that summonses were issued on July 27, 2026. Stockman states that no Defendant has been served with the summons and complaint, no Defendant has appeared, and no answer, motion, or other responsive pleading has been filed.

5. No merits hearing has occurred, no discovery order has been entered, and the state-court action remains at the threshold pleading-and-service stage.

## II. RELATION TO BANKRUPTCY CASE

6. Stockman filed Bankruptcy Case No. 26-20982-dob on June 26, 2026. The stalking complaint was filed while the bankruptcy case was pending under Chapter 11 and expressly alleged that, to the extent any claim or proceeds were property of the bankruptcy estate, the claims were being pursued subject to bankruptcy jurisdiction and administration.

7. The bankruptcy case was later converted to Chapter 7. Samuel D. Sweet is the Chapter 7 Trustee. To the extent any portion of the stalking claims arose prepetition or otherwise constitutes property of the estate under 11 U.S.C. § 541, Trustee Sweet holds the statutory authority provided by 11 U.S.C. §§ 323 and 704. This Notice preserves that authority.

8. The removed complaint overlaps factually with matters already before the Bankruptcy Court concerning Bush, Gaus, Waterman, alleged media coordination, alleged witness and communication activity, preservation of electronic communications, and the effect of that conduct on estate administration and estate causes of action.

9. Any recovery on an estate-owned component of the action could augment the estate, while rulings concerning ownership, standing, preservation, and administration of those claims can affect the rights and duties of the Trustee and the Debtor.

## III. BANKRUPTCY JURISDICTION

10. Jurisdiction exists under 28 U.S.C. § 1334(b) at least to the extent the removed claims are property of, or could conceivably affect, the bankruptcy estate. The Sixth Circuit recognizes related-to jurisdiction when the outcome of a proceeding could conceivably alter the debtor's rights, liabilities, options, or freedom of action or otherwise affect administration of the estate. Robinson v. Michigan Consol. Gas Co., 918 F.2d 579, 583-84 (6th Cir. 1990); In re Wolverine Radio Co., 930 F.2d 1132, 1141-42 (6th Cir. 1991).

11. The complaint itself recognizes the bankruptcy nexus by pleading that claims or proceeds may be property of the bankruptcy estate. After conversion, questions concerning ownership and prosecution of estate claims are matters for administration in the Chapter 7 case.

12. E.D. Mich. LR 83.50(a) refers bankruptcy-related proceedings to the bankruptcy judges, and LR 83.50(d)(1) directs notices of removal under 28 U.S.C. § 1452(a) to the Bankruptcy Clerk while the bankruptcy case is pending.

## IV. PERSONAL-INJURY CHARACTER AND FEDERAL ALLOCATION

13. The state docket categorizes the action as 'Other Personal Injury (NO),' and the complaint seeks damages for alleged civil stalking and resulting emotional distress. Stockman therefore does not ask the Bankruptcy Court to disregard 28 U.S.C. § 157(b)(5).

14. Removal places the matter within the federal bankruptcy system so the Bankruptcy Court can address estate ownership, standing, administration, pretrial coordination, and any remand or abstention issue. If a trial of a personal-injury tort claim must be conducted by the District Court under § 157(b)(5), that allocation can be handled through the existing bankruptcy reference procedures.

15. Stockman consents to entry of final orders and judgment by the Bankruptcy Court only to the fullest extent permitted by 28 U.S.C. § 157 and Article III and does not waive any jury-trial right or statutory allocation under § 157(b)(5).

## V. SERVICE STATUS

16. Although the Saginaw County docket reflects that summonses were issued, Stockman states that none of the Defendants has been served with the summons and complaint.

17. Because no Defendant has been served, no Defendant has been required to answer or otherwise respond, and no Defendant has participated in substantive state-court proceedings.

18. No Defendant has been served with this Notice of Removal before its filing. After docketing, Stockman will promptly serve the filed Notice on all parties as required by Fed. R. Bankr. P. 9027(b) and will file a copy with the Saginaw County Circuit Court. Removal becomes effective upon filing the copy with the state-court clerk under Rule 9027(c).

19. A separate proof or certificate of service will be filed only after service actually occurs.

## VI. TIMING UNDER RULE 9027 AND REQUEST TO PRESERVE THE ISSUE

20. Because the stalking complaint was filed after the bankruptcy case commenced, Fed. R. Bankr. P. 9027(a)(3) governs the removal period.

21. Stockman acknowledges that Rule 9027(a)(3) contains a 30-day timing requirement measured from receipt of the initial pleading or summons. Stockman does not represent that the absence of service on the Defendants, standing alone, eliminates that timing requirement as to him as the party who filed the complaint.

22. The action, however, has never progressed beyond filing and issuance of unserved summonses; no Defendant has appeared; no merits proceedings have occurred; and the bankruptcy case changed from Chapter 11 debtor-in-possession administration to Chapter 7 trustee administration after the state complaint was filed.

23. To the extent the Court determines that the Rule 9027(a)(3) period expired before this Notice was filed, Stockman respectfully preserves the right to seek enlargement under Fed. R. Bankr. P. 9006(b)(1) based on excusable neglect and the intervening conversion, transfer of control over estate-owned causes of action, absence of service or substantive proceedings, and absence of prejudice to any served Defendant.

## VII. TRUSTEE AND ESTATE RIGHTS RESERVED

24. This Notice is not an assertion that every stalking claim belongs to the estate. The complaint includes alleged conduct occurring both before and after the bankruptcy petition, and ownership may differ by claim, act, injury, and applicable bankruptcy law.

25. Stockman does not waive any personal claim that is not property of the estate and does not purport to exercise Trustee Sweet's exclusive authority over an estate-owned cause of action without the Trustee's authorization.

26. Trustee Sweet's rights to ratify, substitute, intervene, prosecute, settle, abandon, or otherwise administer any estate-owned claim are expressly preserved.

## VIII. RULE 9027 RECORD

27. The filed Verified Complaint and Jury Demand is maintained in the state-court record as COMPLAINT - FILED in Case No. 26-001695-NO. The current Saginaw County case-summary docket reflects filing of the complaint and issuance of summonses but no proof of service.

28. Rule 9027(a)(1)(C) requires a copy of all process and pleadings to accompany a notice of removal. Stockman will submit the filed complaint and each issued summons with the removal papers and will promptly supplement any state-court process or pleading not presently available to him if directed by the Court.

## NOTICE AND REQUEST FOR DOCKETING

Stockman therefore gives notice of removal under 28 U.S.C. § 1452(a) and Fed. R. Bankr. P. 9027 and requests that the Bankruptcy Clerk open the removed matter as an adversary proceeding

related to Bankruptcy Case No. 26-20982-dob. Stockman further requests that questions concerning timeliness, estate ownership, standing, personal-injury-tort allocation, remand, abstention, or final adjudicatory authority be determined by the federal court on notice and an appropriate record.

Respectfully submitted,
/s/ David Lewi-Emmanuel Stockman
DAVID LEWI-EMMANUEL STOCKMAN
Debtor; Plaintiff, Pro Se
5805 McCarty Road
Saginaw, Michigan 48603
Telephone: (989) 341-3017
Email: dstockma4@icloud.com
Dated: October 9, 2026

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION - BAY CITY**

In re:
DAVID LEWI-EMMANUEL STOCKMAN,
Debtor.
_______________________________________/

Bankruptcy Case No. 26-20982-dob
Chapter 7
Hon. Daniel S. Opperman

DAVID L. STOCKMAN, M.D.,
Plaintiff,

v.

COLE WATERMAN a/k/a COLE WATERS;
STEPHAN M. GAUS;
MARCUS ATKINS a/k/a LUKE SOLO and a/k/a TODD ATKINS;
SARAH ATKINS;
BRIANN D. SUMMERSETT a/k/a BRI SUMMERSETT;
ROSHAN MAHABIR, M.D. a/k/a AMERICAN BUSINESS;
SHANE STARR; and
RUSSELL L. BUSH,
Defendants.
_______________________________________/

Adversary Proceeding No. __________ (to be assigned)

Removed from Saginaw County Circuit Court
Case No. 26-001695-NO
Hon. Julie A. Gafkay

**STATEMENT REGARDING SERVICE STATUS**

As of the filing of the foregoing Notice of Removal, no Defendant has been served with the summons and complaint in Saginaw County Circuit Court Case No. 26-001695-NO, and no Defendant has been served with the Notice of Removal. The state docket reflects issuance of summonses but no proof of service, answer, appearance, or responsive pleading. After the Bankruptcy Clerk dockets the Notice, Stockman will promptly serve the filed Notice as required by Fed. R. Bankr. P. 9027(b) and will separately file a certificate or proof of service identifying the persons served, method of service, and date of service.

/s/ David Lewi-Emmanuel Stockman
DAVID LEWI-EMMANUEL STOCKMAN
Debtor; Plaintiff, Pro Se
Dated: October 9, 2026

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION - BAY CITY**

In re:
DAVID LEWI-EMMANUEL STOCKMAN,
Debtor.
_______________________________________/

Bankruptcy Case No. 26-20982-dob
Chapter 7
Hon. Daniel S. Opperman

DAVID L. STOCKMAN, M.D.,
Plaintiff,

v.

COLE WATERMAN a/k/a COLE WATERS;
STEPHAN M. GAUS;
MARCUS ATKINS a/k/a LUKE SOLO and a/k/a TODD ATKINS;
SARAH ATKINS;
BRIANN D. SUMMERSETT a/k/a BRI SUMMERSETT;
ROSHAN MAHABIR, M.D. a/k/a AMERICAN BUSINESS;
SHANE STARR; and
RUSSELL L. BUSH,
Defendants.
_______________________________________/

Adversary Proceeding No. __________
(to be assigned)

Removed from Saginaw County Circuit Court
Case No. 26-001695-NO
Hon. Julie A. Gafkay

EXHIBT A

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF SAGINAW

| | |
|---|---|
| **DAVID L. STOCKMAN, M.D.,**<br>Plaintiff,<br><br>v.<br><br>**COLE WATERMAN a/k/a COLE WATERS;**<br>**STEPHAN M. GAUS;**<br>**MARCUS ATKINS a/k/a LUKE SOLO and a/k/a TODD ATKINS;**<br>**SARAH ATKINS, individually and as an alleged joint operator of the LUKE SOLO family Facebook account;**<br>**BRIANN D. SUMMERSETT a/k/a BRI SUMMERSETT;**<br>**ROSHAN MAHABIR, M.D. a/k/a AMERICAN BUSINESS;**<br>**SHANE STARR; and**<br>**RUSSELL L. BUSH,**<br>Defendants. | **Case No. 26-001695 -NO**<br>Hon. **JUDGE JULIE A. GAFKAY**<br><br>**Case Type: Other Personal Injury (NO)**<br><br>**VERIFIED COMPLAINT FOR CIVIL STALKING, DAMAGES, NARROWLY TAILORED INJUNCTIVE RELIEF, AND JURY DEMAND**<br><br>CIRCUIT COURT RECORDS OFFICE<br>SAGINAW, MICHIGAN<br>FILED<br>**July 27, 2026**<br>VANESSA GUERRA<br>SAGINAW COUNTY CLERK |

## VERIFIED COMPLAINT AND JURY DEMAND

Plaintiff David L. Stockman, M.D. ("Plaintiff"), appearing in propria persona and, to the extent the claims or proceeds are property of his Chapter 11 estate, as debtor in possession, alleges as follows:

## NATURE OF THE ACTION

**1.** This is a civil action under MCL 600.2954 for damages and other relief resulting from conduct prohibited by MCL 750.411h.

**2.** The action is based on an alleged repeated and willful course directed toward Plaintiff through direct media threats, solicitation of adverse information, advance coordination of media releases, synchronized republication, pseudonymous and shared account activity, repeated family identification, publication of restricted forensic-workspace imagery, display of mocking apparel using Plaintiff's image and signature, and deliberate continuation after notice of inaccuracies and requests that the conduct stop.

**3.** Plaintiff alleges that Defendants repeatedly knew before publication that adverse media coverage concerning Plaintiff was forthcoming because Defendants communicated by text message, social-media message, telephone, or other electronic means concerning the expected release and its timing around litigation events involving Defendant Russell L. Bush.

**4.** Plaintiff further alleges that Defendants then echoed, promoted, republished, endorsed, or expanded the anticipated publication through their respective social and professional networks, thereby creating recurring waves of hostile attention and additional unwanted contacts directed toward Plaintiff and his family.

**5.** Defendant Stephan M. Gaus allegedly used threatened media release as leverage, stating on multiple occasions that additional adverse publicity would be released or facilitated if Plaintiff did not

agree to terms demanded by Gaus or Gaus's client. Attorney James Kelly is a firsthand witness to those communications.

**6.** The campaign reached Plaintiff's minor child's school community. Plaintiff alleges that parents reacted to and repeated the publicity, that their children excluded, ridiculed, and mistreated Plaintiff's son, and that Plaintiff and his spouse ultimately withdrew the child from school to protect him.

**7.** Plaintiff actually felt terrorized, frightened, intimidated, threatened, and harassed. He experienced significant anxiety, sleep disruption, impaired concentration, humiliation, concern for workplace security, fear for his wife and child, and fear that members of the public would appear at his office or act on repeated criminal accusations.

**8.** Plaintiff does not seek liability for truthful reporting, protected opinion, fair and accurate reporting of judicial records, legitimate petitioning, lawful public-record requests, ordinary legal advocacy, genuine consumer commentary, or any other constitutionally protected conduct or conduct serving a legitimate purpose.

**9.** Plaintiff asserts one cause of action only: civil stalking under MCL 600.2954 based on conduct prohibited by MCL 750.411h. Statements, articles, photographs, apparel, communications, and account activity are pleaded as alleged contacts, acts, context, evidence of identity, willfulness, continuity of purpose, causation, lack of legitimate purpose, and actual effect.

## JURISDICTION, VENUE, STANDING, AND TIMELINESS

**10.** This Court has subject-matter jurisdiction under Const 1963, art 6, § 13 and MCL 600.605 because Plaintiff seeks damages exceeding $25,000 and equitable relief.

**11.** Venue is proper in Saginaw County under MCL 600.1629 because substantial parts of the alleged course occurred in or were directed toward Saginaw County, Plaintiff resides or conducts business here, Plaintiff's offices and family were targeted here, and the principal injury was suffered here.

**12.** Plaintiff is the debtor and debtor in possession in In re David Lewi-Emmanuel Stockman, Bankruptcy Case No. 26-20982-dob, pending in the United States Bankruptcy Court for the Eastern District of Michigan under Chapter 11, Subchapter V.

**13.** To the extent any claim or proceeds constitute property of the bankruptcy estate under 11 USC 541 or 1186, Plaintiff prosecutes the claim in his capacity as debtor in possession under 11 USC 1184, subject to the Bankruptcy Court's jurisdiction and applicable disclosure and administration requirements.

**14.** Plaintiff seeks damages only for conduct within the applicable limitations period. Earlier acts are alleged as background, account-identification evidence, notice, continuity-of-purpose evidence, causation, and context for the reasonable and actual fear produced by timely conduct.

**15.** The amount sought is not a sum certain and exceeds $25,000. Consistent with MCR 2.111(B)(2), Plaintiff does not plead a specific dollar amount.

## PARTIES

**16.** Plaintiff is a Michigan physician and business owner whose work, offices, family life, and community relationships are centered in Saginaw County.

**17.** Defendant Cole Waterman is a reporter who authored and personally promoted numerous publications concerning Plaintiff. Plaintiff alleges that Waterman also used the name "Cole Waters" when personally posting an article concerning Plaintiff, as reflected in Exhibit K.

**18.** Defendant Stephan M. Gaus is a Michigan attorney who represented Bush and other persons adverse to Plaintiff and allegedly served as a principal source and communicator to Waterman concerning Plaintiff.

**19.** Defendant Russell L. Bush is Plaintiff's former employee and later an adverse party in employment, arbitration, civil, collection, bankruptcy-related, and county-contract disputes. Bush was represented by Gaus.

**20.** Defendant Marcus Atkins allegedly operated or jointly operated the Facebook identity "Luke Solo," used or participated in the use of the name "Todd Atkins," contacted persons to solicit adverse information concerning Plaintiff, communicated information to Waterman, and repeatedly posted material concerning Plaintiff.

**21.** Defendant Sarah Atkins is Marcus Atkins's spouse. She is not sued merely because of that relationship. Plaintiff alleges that she jointly operated, accessed, authorized, ratified, or participated through the Luke Solo family account and participated in advance-publication and amplification communications.

**22.** Defendant Briann D. Summersett repeatedly commented on, reposted, and promoted material concerning Plaintiff and Plaintiff-affiliated forensic operations and published or republished imagery from a forensic or autopsy workspace.

**23.** Defendant Roshan Mahabir, M.D., formerly worked with a Plaintiff-affiliated entity. Plaintiff alleges on information and belief that Mahabir operated or controlled the Google identity "American Business."

**24.** Defendant Shane Starr knowingly wore and displayed a custom shirt bearing Plaintiff's face, purported signature, name, medical degree, and professional designation and posed for photographs published online.

## STATUTORY FRAMEWORK

**25.** MCL 600.2954 authorizes a victim to maintain a civil action against an individual who engages in conduct prohibited by MCL 750.411h and permits recovery of resulting damages, exemplary damages, costs, and reasonable attorney fees.

**26.** MCL 750.411h defines a "course of conduct" as a pattern composed of two or more separate, noncontinuous acts evidencing continuity of purpose.

**27.** The statute defines harassment as conduct directed toward a victim that includes repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim emotional distress.

**28.** The statute defines stalking as a willful course involving repeated or continuing harassment that would cause a reasonable individual to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel one or more of those reactions.

**29.** Unconsented contact includes contact initiated or continued without consent or in disregard of an expressed desire that contact be avoided or discontinued and includes, among other things,

electronic communications, telephone contact, workplace contact, confrontation, and delivery or placement of an object.

**30.** Constitutionally protected activity and conduct serving a legitimate purpose are excluded. Plaintiff therefore seeks liability only for conduct proven to fall outside those exclusions.

**31.** Each Defendant's liability must be determined separately. Plaintiff does not seek collective liability merely because persons knew one another, were married, represented one another, worked together, shared criticism, or participated in the same public discussion.

**32.** The overlapping timing, communications, source relationships, publication sequence, and common language are alleged as evidence of identity, knowledge, willfulness, continuity of purpose, causation, and the actual effect of each Defendant's personally attributable course.

## COMMON FACTS: RECURRING TARGETING AND ESCALATION

**33.** From 2024 through 2026, with older conduct pleaded as background, Plaintiff was repeatedly made the subject of articles, broadcasts, Facebook posts, Google reviews, comments, photographs, and other online material circulated through MLive, The Saginaw News, The Bay City Times, ABC12 News, AskSaginaw, Facebook, Google, and related local networks.

**34.** The recurring material used Plaintiff's name, photograph, profession, offices, businesses, litigation, bankruptcies, employees, vendors, county work, and medical-license status as repeated subjects.

**35.** The resulting forums included comments calling Plaintiff a criminal, demanding that he be imprisoned, demanding that his medical license be taken, and encouraging people to join together and appear at his office.

**36.** A hostile Google review posted through the American Business identity identified Plaintiff's wife and minor child by name. See Exhibit O.

**37.** A custom shirt displayed Plaintiff's face on the front and Plaintiff's purported signature, name, medical degree, and professional designation on the rear. See Exhibit P.

**38.** The shirt was photographed and publicized with hashtags and commentary accusing Plaintiff of criminal conduct, stealing microscopes, and performing autopsies without a license. See Exhibit P.

**39.** Summersett published or republished imagery apparently taken inside a restricted forensic or autopsy workspace and used it to ridicule or sensationalize Plaintiff's professional operations. See Exhibit N.

**40.** In context, the recurring criminal accusations, family identification, office references, professional targeting, custom apparel, restricted-workspace imagery, and calls for in-person action created an escalating environment that Plaintiff reasonably perceived as dangerous to himself, his family, employees, patients, and offices.

**41.** Plaintiff repeatedly communicated, directly or through representatives, that the targeting, family identification, inaccuracies, and resulting contacts were unwanted and harmful.

**42.** The challenged conduct continued after Defendants knew or had reason to know of Plaintiff's objections, family-safety concerns, office-security concerns, and severe emotional distress.

## SYNCHRONIZATION WITH BUSH LITIGATION EVENTS AND ADVANCE NOTICE

**43.** The publications did not arise solely as isolated or independently discovered reporting events. On repeated occasions, adverse media coverage concerning Plaintiff was synchronized with hearings, arbitration activity, anticipated rulings, judgment activity, collection efforts, bankruptcy filings, remand proceedings, or other developments in litigation involving Bush.

**44.** Gaus and Bush possessed advance knowledge of relevant litigation events and communicated with Waterman or other media personnel before multiple publications concerning those events.

**45.** Gaus and Marcus Atkins repeatedly contacted current or former employees, professional associates, contractors, officials, community members, or other persons connected to Plaintiff to solicit additional adverse information concerning Plaintiff, his businesses, his work, his family, and pending disputes.

**46.** Gaus and Marcus Atkins served as principal communicators or conduits through whom allegations, characterizations, documents, event timing, and other information were transmitted to Waterman.

**47.** Before multiple publications became publicly available, Defendants communicated with one another through text messages, group messages, social-media messages, telephone calls, or other electronic communications advising that another article, broadcast, or adverse publication concerning Plaintiff was about to be released.

**48.** Those communications conveyed advance knowledge of the anticipated publication, its subject matter, its connection to a Bush-litigation event, its expected timing, or its anticipated release date.

**49.** Plaintiff alleges, based on contemporaneous statements, publication timing, and information received, that each Defendant knew before release of at least one relevant publication that the publication was forthcoming.

**50.** The advance notice permitted Defendants to anticipate, prepare for, and participate in immediate dissemination and amplification when the publication became publicly available.

**51.** Upon release, Defendants promptly reposted, linked, commented upon, endorsed, repeated, or expanded the publication and its accusations through Facebook, Google, and other social or professional networks.

**52.** The recurring sequence included: an anticipated Bush-litigation event; information gathering or source communication by Gaus, Bush, or Marcus Atkins; communication with Waterman; advance notice among Defendants; publication near the litigation event; and immediate or prompt social-media amplification.

**53.** The repetition of that sequence across separate events supports the inference that the conduct was deliberate, anticipated, and undertaken with continuity of purpose rather than accidental or coincidental.

**54.** Plaintiff alleges that text messages and related electronic communications exist documenting advance knowledge, expected release timing, source communications, and plans to repost or amplify the publications. Those communications are presently within Defendants' or third parties' possession.

**55.** Plaintiff does not allege that advance knowledge of a news article or republication standing alone constitutes stalking. He alleges that the advance communications and synchronized amplification

were components of a broader repeated course intended to renew unwanted pressure, contacts, intimidation, humiliation, and fear directed toward Plaintiff and his family.

## GAUS'S MEDIA THREATS AND ATTORNEY JAMES KELLY'S FIRSTHAND KNOWLEDGE

**56.** On multiple occasions, Gaus communicated directly with Plaintiff or Plaintiff's representatives and threatened or warned that additional adverse media coverage concerning Plaintiff would be released, initiated, or facilitated if Plaintiff did not accept terms demanded by Gaus or Gaus's client.

**57.** Gaus did not merely observe that litigation proceedings were public or that independent reporters might cover them. Plaintiff alleges that Gaus affirmatively linked the prospect of adverse publicity to Plaintiff's acceptance or rejection of demanded terms.

**58.** Attorney James Kelly personally witnessed, heard, or received communications in which Gaus made those media threats or warnings and can testify from firsthand knowledge concerning the participants, approximate dates, method of communication, terms demanded, words used, threatened publicity, and surrounding circumstances.

**59.** Kelly can also testify concerning the temporal relationship between Gaus's threatened media release, Plaintiff's rejection or nonacceptance of demanded terms, and adverse media coverage that followed.

**60.** Kelly contemporaneously communicated the substance and seriousness of Gaus's statements to Plaintiff, causing Plaintiff to understand that the threatened publicity was deliberate, imminent, and being used as leverage against Plaintiff and his family.

**61.** The existence of a firsthand attorney witness distinguishes these allegations from an inference based solely on publication timing.

**62.** Plaintiff alleges the threatened media releases as direct, deliberate, and unwanted contacts and as evidence that the publication campaign was used for pressure beyond the adjudication of the underlying litigation.

## NOTICE OF INACCURACIES, REQUESTS FOR CORRECTION, AND DELIBERATE CONTINUATION

**63.** Plaintiff and his representatives, including Kelly, repeatedly notified Waterman, Gaus, and other participating Defendants that publications, posts, and recurring accusations concerning Plaintiff contained factual inaccuracies, omitted material subsequent developments, confused entity obligations with personal conduct, or continued to present disputed, nonfinal, dismissed, vacated, resolved, or superseded allegations as current established facts.

**64.** Plaintiff and his representatives identified specific matters requiring correction, clarification, retraction, supplementation, or updating and, where applicable, supplied court records, orders, correspondence, licensing information, business records, or other supporting documentation.

**65.** Despite notice, Waterman and the other Defendants who authored, supplied, posted, or republished material failed or refused to make meaningful corrections to their own statements, append material updates, acknowledge contrary documentation, or advise their audiences that previously repeated assertions were disputed or superseded.

**66.** Defendants instead permitted the material to remain publicly available and continued to circulate, link to, endorse, repeat, or amplify the same or materially similar narratives in later publication events.

**67.** Later publications and posts recycled earlier allegations without fairly acknowledging relevant dismissals, reversals, vacated rulings, resolved matters, contrary documentation, or corrections previously supplied by Plaintiff or his representatives.

**68.** The same uncorrected narratives were repeatedly renewed around separate Bush-litigation events after Defendants had actual notice that Plaintiff challenged their accuracy, completeness, or continued presentation.

**69.** The failure to correct after specific notice, followed by later repetition and synchronized republication, supports the inference that the continuing course was knowing and deliberate rather than accidental or mistaken.

**70.** The refusal to correct intensified Plaintiff's distress because it demonstrated that supplying documentary information would not end the targeting and that the same accusations would continue to be circulated regardless of subsequent developments or contrary evidence.

**71.** The absence of corrections allowed the allegations to remain accessible within local professional, business, community, and school-related networks and to be repeatedly presented to new readers as current and unrebutted.

**72.** Plaintiff does not claim that failure to issue a correction, standing alone, constitutes stalking or creates an independent cause of action. The lack of correction is alleged as evidence of notice, knowledge, willfulness, continuity of purpose, disregard of Plaintiff's objections, causation, and deliberate continuation of later qualifying acts.

## FAMILY AND SCHOOL HARM; ACTUAL EMOTIONAL DISTRESS

**73.** The publicity and social-media amplification spread through local community and school-related networks in which Plaintiff and his family lived and worked.

**74.** Parents associated with Plaintiff's minor child's school became aware of, reacted to, repeated, or relied upon allegations and hostility concerning Plaintiff.

**75.** Children of those parents excluded, ridiculed, mistreated, or otherwise harmed Plaintiff's son because of hostility and accusations communicated or repeated within the surrounding adult community.

**76.** Plaintiff personally observed the consequences and received information from his child, his spouse, school personnel, parents, or other witnesses concerning the exclusion and mistreatment.

**77.** Plaintiff and his spouse attempted to protect the child and address the hostile environment. The conditions became sufficiently severe that they withdrew their son from the school.

**78.** The withdrawal was not undertaken merely because Plaintiff disliked public criticism. It was a protective response to an environment in which the campaign had reached Plaintiff's child and was harming the child's social safety and wellbeing.

**79.** The need to withdraw his child from school substantially intensified Plaintiff's anxiety, fear, guilt, sleep disruption, impaired concentration, concern for his family's safety, and feeling that the course had invaded every part of his professional and family life.

**80.** Plaintiff actually felt terrorized, frightened, intimidated, threatened, and harassed by the threatened media releases, repeated information gathering, advance publication coordination, synchronized republication, family identification, local-network dissemination, lack of correction, and resulting harm to his child.

**81.** A reasonable person subjected to the same repeated conduct, office-confrontation encouragement, family identification, and school consequences would likewise feel terrorized, frightened, intimidated, threatened, and harassed.

**82.** Plaintiff also experienced humiliation, persistent anxiety, sleep disruption, impaired concentration, fear for office safety, fear for employees and patients, concern for his wife and child, and fear that third parties would physically confront him or act on repeated criminal accusations.

**83.** Plaintiff's verified declaration attached as Exhibit J further describes his actual emotional distress and family-safety concerns.

## DEFENDANT-SPECIFIC FACTS

### A. COLE WATERMAN a/k/a COLE WATERS

**84.** Waterman authored the eight complete articles attached as Exhibits A through H, including publications dated June 14, 2024; July 31, 2024; August 5, 2024; April 2, 2025; May 6, 2025; May 21, 2025; and May 30, 2025.

**85.** Each new article became an occasion to repeat numerous older, unrelated, disputed, nonfinal, dismissed, vacated, resolved, or entity-specific matters, creating a cumulative personalized narrative rather than limiting the report to the new event.

**86.** Waterman personally promoted an article under the name "Cole Waters" and wrote: "Some more unsavory news on the Dr. David L. Stockman front, this one extending all the way north to the Upper Peninsula's Marquette County." See Exhibit K.

**87.** The same or similar articles were repeatedly promoted through MLive-affiliated social-media pages, creating recurring forums for hostile comments and additional contacts. See Exhibit K.

**88.** Waterman repeatedly used Gaus, Bush-related allegations, and information communicated by Gaus or Marcus Atkins as principal sources concerning Plaintiff.

**89.** Plaintiff alleges that Waterman communicated with Gaus, Bush, or Marcus Atkins before multiple publications and knew that the publications were being synchronized with Bush-litigation events and would be immediately echoed through Defendants' social networks.

**90.** Waterman received or had access to correction requests and contrary or supplemental documentation but failed to make meaningful corrections and later continued the same or materially similar narrative.

**91.** Plaintiff does not base liability on legitimate authorship of news reports, protected opinion, fair-report activity, or lawful newsgathering. Plaintiff seeks liability from Waterman only for personally attributable conduct proven to have gone beyond those protections and to satisfy every element of MCL 750.411h.

### B. STEPHAN M. GAUS

**92.** Gaus represented Bush and other persons adverse to Plaintiff in litigation and related disputes.

**93.** Gaus repeatedly communicated extrajudicially with Waterman and other media participants near hearings, arbitration events, anticipated rulings, judgment activity, bankruptcy filings, collection activity, and remand proceedings.

**94.** Waterman's publications repeatedly identify or quote Gaus as a source concerning Plaintiff's litigation, collection, employment, bankruptcy, and professional matters. See Exhibits A through H.

**95.** Gaus supplied personalized characterizations, including the nicknames "Deadline Dave" and "Dr. Last Minute," which Waterman published. See Exhibit F.

**96.** Gaus repeatedly contacted persons connected to Plaintiff to solicit adverse information and served as a primary conduit to Waterman.

**97.** Gaus threatened or warned that additional adverse media coverage would be released or facilitated if Plaintiff did not accept demanded terms, and Kelly is a firsthand witness to those communications.

**98.** Gaus knew that publications would be immediately amplified by the other Defendants and communicated advance notice concerning expected media releases.

**99.** Gaus continued to supply or repeat narratives after receiving correction requests and contrary or supplemental information.

**100.** Plaintiff does not base this claim on pleadings, testimony, courtroom advocacy, ordinary representation, legitimate settlement advocacy, protected opinion, or privileged litigation conduct. The claim applies only to repeated personally attributable conduct proven to fall outside those protections and to satisfy MCL 750.411h.

## C. RUSSELL L. BUSH

**101.** Bush formerly worked for Plaintiff or a Plaintiff-affiliated entity and later became adverse to Plaintiff in employment, county-contract, arbitration, civil, collection, bankruptcy-related, and remand proceedings.

**102.** Gaus represented Bush, and numerous Waterman publications were timed around Bush-related proceedings and relied on Bush-related allegations, the arbitration award, anticipated judgment enforcement, and statements attributed to Gaus.

**103.** Bush and Gaus repeatedly communicated with Waterman or other media personnel concerning Plaintiff, supplied documents or advance notice of litigation events, and encouraged publication or republication designed to renew public pressure outside the adjudication of the underlying dispute.

**104.** Bush possessed or had access to an autopsy report bearing Plaintiff's electronic signature. Plaintiff alleges on information and belief that Bush transmitted, supplied, or facilitated the copied signature used on the custom shirt depicted in Exhibit P.

**105.** Plaintiff further alleges that Bush possessed, displayed, approved, promoted, or participated in distribution of one or more custom shirts and communicated with Summersett, Atkins, Starr, Gaus, or others concerning the shirt or related campaign.

**106.** Bush participated in advance-publication communications and knew that adverse coverage was forthcoming before public release.

**107.** Bush contacted or encouraged former employees or associates to make public, police, administrative, or media complaints and those allegations were later repeated in media coverage concerning Plaintiff.

**108.** Plaintiff does not base this claim on Bush's pleadings, testimony, legitimate petitioning, or ordinary participation in litigation. The claim applies only to personally attributable conduct proven to fall outside applicable protections and to satisfy MCL 750.411h.

### D. MARCUS ATKINS, SARAH ATKINS, LUKE SOLO, AND TODD ATKINS

**109.** On information and belief, Luke Solo is a shared or family Facebook account operated, controlled, accessed, or maintained by Marcus Atkins and Sarah Atkins.

**110.** The Luke Solo account repeatedly commented in public threads concerning Plaintiff's businesses, employment practices, credentials, autopsy work, vendors, county contracts, and litigation. See Exhibit L.

**111.** The account referred to Plaintiff as a "fake forensic pathologist," stated that employers should be avoided "like plague," linked material calling for Plaintiff's license to be taken, and posted extended accusations concerning payroll, vendors, physicians, reports, and autopsies. See Exhibit L.

**112.** The account repeatedly linked readers to additional articles and replied to commenters, thereby renewing and extending the discussion.

**113.** On May 22, 2024, a person using the name "Todd Atkins" requested a 67-page electronic copy of a complaint in Wildfire Credit Union v Stockman, Saginaw County Case No. 24-000909-CB. See Exhibit I.

**114.** Plaintiff does not allege that the public-record request itself was wrongful. It is pleaded as evidence relevant to identity, timing, knowledge, and use of the Todd Atkins name.

**115.** Marcus Atkins repeatedly contacted persons connected to Plaintiff to solicit additional adverse information and acted as a primary communicator to Waterman.

**116.** Marcus and Sarah Atkins received or participated in advance communications that media publications were about to be released and thereafter used the Luke Solo account or related accounts to echo, link, comment upon, or amplify those publications.

**117.** Plaintiff alleges on information and belief that Marcus Atkins created, obtained, supplied, or participated in the custom shirt depicted in Exhibit P.

**118.** Marcus and Sarah Atkins were placed on notice that the repeated family and professional targeting was unwanted and harmful but did not correct their own posts and continued the course.

**119.** Sarah Atkins is not alleged to be liable merely because she is married to Marcus Atkins. Her liability depends on proof that she personally authored, authorized, ratified, participated in, or knowingly caused at least two qualifying acts.

### E. BRIANN D. SUMMERSETT

**120.** Summersett repeatedly commented on, reposted, and promoted articles and broadcasts concerning Plaintiff and Plaintiff-affiliated forensic operations. See Exhibit M.

**121.** Summersett commented "RICO" under an ABC12 report concerning an Attorney General investigation. See Exhibit M.

**122.** Summersett directed readers to email county commissioners individually, supplied a county official's email address, and wrote that Saginaw families should identify those responsible and "demand change." See Exhibit M.

**123.** Summersett responded "Ruth absolutely!" to a third-party comment calling Plaintiff and his business partner criminal and accusing them of years of bounced checks and misuse of positions. See Exhibit M.

**124.** Summersett repeatedly republished county medical-examiner and investigation coverage over time and, on information and belief, received advance notice before at least one publication event.

**125.** Summersett published or republished forensic-workspace imagery captioned "Throw back to this gem!" and overlaid with "#MentalHealth Awareness." See Exhibit N.

**126.** Plaintiff alleges that the imagery was posted without authorization and was used to ridicule or sensationalize Plaintiff's forensic operations.

**127.** Summersett was placed on notice that the targeting and resulting family and office concerns were unwanted but failed to correct her own posts and continued to republish or endorse the same narratives.

**128.** Earlier Summersett activity is offered as background and continuity evidence. Plaintiff seeks damages only for timely conduct and resulting injury.

**F. ROSHAN MAHABIR, M.D. a/k/a AMERICAN BUSINESS**

**129.** Mahabir formerly worked with or for a Plaintiff-affiliated entity and later became adverse to Plaintiff.

**130.** Plaintiff alleges on information and belief that Mahabir operated or controlled the Google Local Guide identity American Business.

**131.** The American Business account posted a one-star review of miHealth Dermatology naming Plaintiff, Plaintiff's wife, and Plaintiff's minor son. See Exhibit O.

**132.** The American Business account separately posted a one-star review of the Michigan Institute of Forensic Science and Medicine alleging that no one answered the phone, employees were not paid, and the operation deteriorated after a doctor resigned. See Exhibit O.

**133.** Plaintiff alleges that the reviews were not genuine independent patient reviews but were posted by a former professional associate for a targeted hostile purpose.

**134.** The family-name publication was unnecessary to any legitimate review of medical care and foreseeably expanded the target of hostility to Plaintiff's wife and child.

**135.** On information and belief, Mahabir received advance information concerning at least one publication or coordinated narrative and echoed or reinforced that narrative through the American Business account.

**136.** Mahabir failed to correct or remove his own family-identifying review after notice of its harmful effect.

**G. SHANE STARR AND THE CUSTOM T-SHIRT DISPLAY**

**137.** On or about August 30, 2024, Jennifer Norfleet published photographs showing Starr wearing and displaying a custom shirt concerning Plaintiff. See Exhibit P.

**138.** The front displayed a large photograph of Plaintiff's face and the wording "Are we all "disgruntled?"" The back displayed Plaintiff's purported signature, name, medical degree, the words "Forensic Pathologist," and a notation stating "Notary Signed on 04-18-2021."

**139.** Norfleet's post stated in substance that only Starr could get away with the shirt, that she was "LOVIN IT," and included hashtags referring to criminal life, stealing microscopes, and autopsies without a license. See Exhibit P.

**140.** Starr knowingly obtained or accepted the shirt, wore and displayed it, separately posed to display its front and rear, and consented to, encouraged, approved, or ratified the taking and online publication of the photographs.

**141.** On information and belief, Starr wore, displayed, promoted, or permitted dissemination of the shirt on more than one separate occasion and participated in communications concerning its creation, possession, display, or publication.

**142.** Starr knew of the broader synchronized publication campaign and intended the display to ridicule, provoke, humiliate, or amplify hostility directed toward Plaintiff.

**143.** Plaintiff does not allege that a single isolated wearing of expressive apparel, standing alone, satisfies the statute. Starr's liability depends on proof of at least two separate qualifying acts and all other statutory elements.

## THIRD-PARTY ESCALATION AND CAUSATION

**144.** Exhibit Q includes anonymous comments referring to Plaintiff and a business associate as criminals and other hostile accusations that received visible reactions from persons connected to the broader campaign.

**145.** Exhibit L includes a comment stating that Plaintiff needed to be locked up and his license taken.

**146.** Plaintiff personally observed a comment stating in substance that people should join together and show up at his office.

**147.** Plaintiff does not allege that every third-party commenter is a Defendant or that every hostile statement is legally attributable to a named Defendant.

**148.** Plaintiff alleges that Defendants' repeated and synchronized conduct foreseeably created and sustained forums for escalating hostility, caused additional unwanted contacts and local dissemination, and intensified the actual emotional distress described in Exhibit J.

**149.** The resulting hostility reached Plaintiff's child's school community and materially contributed to the exclusion and mistreatment that caused Plaintiff and his spouse to withdraw the child.

## COUNT I

## CIVIL STALKING AGAINST ALL DEFENDANTS

## MCL 600.2954; MCL 750.411h

**150.** Plaintiff incorporates paragraphs 1 through 149 as though fully restated.

**151.** Each Defendant individually engaged in, authorized, ratified, or knowingly caused a willful course composed of at least two separate, noncontinuous acts evidencing continuity of purpose.

**152.** The alleged courses were directed toward Plaintiff through direct communications, threatened publicity, solicitation of information for use against him, advance-publication communications, synchronized republication, family identification, professional targeting, office-related escalation, pseudonymous account activity, or other acts reasonably calculated to reach Plaintiff and produce additional unwanted contacts, pressure, intimidation, humiliation, or fear.

**153.** The conduct was initiated or continued without Plaintiff's consent or in disregard of Plaintiff's expressed or reasonably apparent desire that the personalized targeting, family identification, direct media threats, hostile contacts, and physical-confrontation encouragement stop.

**154.** Plaintiff and his representatives gave notice of the harmful effect, requested corrections or discontinuation, and supplied contrary or supplemental information, but the relevant Defendants continued their personally attributable courses.

**155.** The advance-publication texts and messages, repeated synchronization with Bush-litigation events, information gathering by Gaus and Marcus Atkins, Gaus's media threats, and immediate post-publication amplification demonstrate willfulness and continuity of purpose.

**156.** The failure to correct after notice, followed by later repetition, supports knowledge, deliberate continuation, and disregard of Plaintiff's objections.

**157.** The course attributable to Waterman includes multiple separate publication and personal-promotion events, prepublication source communications, advance coordination, and later repetition after correction requests, but liability is sought only for conduct proven to fall outside protected journalism, fair-report activity, opinion, and legitimate newsgathering.

**158.** The course attributable to Gaus includes multiple separate direct media threats, repeated extrajudicial source communications, solicitation of adverse information, advance-publication communications, and continued use of publicity as pressure after notice, but liability is sought only for conduct proven to fall outside protected advocacy, privilege, and legitimate representation.

**159.** The course attributable to Bush includes repeated source or media communications, advance notice and synchronization, alleged facilitation of Plaintiff's copied signature and custom shirt, and repeated coordination of public pressure, but liability is sought only for conduct proven to fall outside protected petitioning, testimony, and litigation activity.

**160.** The course attributable to Marcus Atkins includes repeated Luke Solo posts and links, use of the Todd Atkins identity, solicitation of adverse information, communications to Waterman, advance-publication communications, and alleged participation in the custom shirt.

**161.** The course attributable to Sarah Atkins includes separately occurring Luke Solo account activity and advance-publication or amplification communications personally authored, authorized, ratified, participated in, or knowingly caused by her.

**162.** The course attributable to Summersett includes separately occurring republication and commentary events, endorsement of criminal accusations, public-pressure posts, publication of restricted-workspace imagery, and continued republication after notice.

**163.** The course attributable to Mahabir includes the two separate American Business reviews, family identification, and continued maintenance or repetition after notice, subject to proof that Mahabir operated or controlled the account.

**164.** The course attributable to Starr includes at least two separate acts of obtaining, displaying, promoting, authorizing publication of, or permitting continued dissemination of the custom shirt, subject to proof that those acts were separate and noncontinuous.

**165.** Each actionable course would cause a reasonable person in Plaintiff's circumstances to suffer significant emotional distress and to feel terrorized, frightened, intimidated, threatened, and harassed.

**166.** Each actionable course actually caused or substantially contributed to Plaintiff's significant mental suffering, anxiety, humiliation, sleep disruption, impaired concentration, workplace-security concerns, fear for his family, and fear of physical confrontation or escalation.

**167.** The actual effect was severe and concrete: the recurring campaign reached Plaintiff's child's school, contributed to exclusion and mistreatment of the child, and caused Plaintiff and his spouse to withdraw their son from school.

**168.** Plaintiff alleges that each Defendant intended the natural consequences of the personally attributable course or acted with reckless disregard of those consequences.

**169.** Plaintiff seeks no liability for constitutionally protected expression or conduct serving a legitimate purpose. Liability is requested only as to acts proven to satisfy every element of MCL 750.411h.

**170.** As a direct and proximate result of the actionable conduct, Plaintiff suffered actual and consequential damages in an amount exceeding $25,000.

**171.** Under MCL 600.2954, Plaintiff is entitled to recover resulting damages and may be awarded exemplary damages, costs, and reasonable attorney fees.

## PRAYER FOR RELIEF

**A.** Enter judgment under MCL 600.2954 against each Defendant whose individually attributable course is proven to satisfy MCL 750.411h;

**B.** Award Plaintiff actual and consequential damages exceeding $25,000 in an amount determined by the trier of fact;

**C.** Award exemplary damages, taxable costs, and reasonable attorney fees as authorized by MCL 600.2954;

**D.** After appropriate findings and consistent with the First Amendment and other applicable law, enter narrowly tailored preliminary and permanent injunctive relief prohibiting further unlawful stalking, direct or indirect unconsented contact, true threats, impersonation used to evade no-contact demands, encouragement or organization of unwanted physical confrontation, and unlawful dissemination of restricted forensic or decedent imagery;

**E.** Order preservation of relevant electronically stored information and physical evidence, including original posts, deleted content, account records, login histories, source communications, text messages, publication-timing records, correction requests, custom-shirt design and production records, original photographs, and related metadata;

**F.** Permit amendment when justice requires based on properly obtained account-identification, source, communication, and publication-timing evidence; and

**G.** Grant all other relief the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

**Respectfully submitted,**
Dated: July 27, 2026

**/s/ David L. Stockman, M.D.**
DAVID L. STOCKMAN, M.D.
Plaintiff, in propria persona
3871 Fortune Boulevard
Saginaw, Michigan 48603
Telephone: (989) 341-3017
Email: dstockma4@icloud.com

## VERIFICATION

I, David L. Stockman, M.D., declare under the penalties of perjury that this Verified Complaint has been examined by me and that its contents are true to the best of my information, knowledge, and belief. I understand that my signature is subject to MCR 1.109(E).

Dated: July 27, 2026

**/s/ David L. Stockman, M.D.**
DAVID L. STOCKMAN, M.D.

## EXHIBIT INDEX

| Exhibit | Description |
|---|---|
| A | AG's Office to Weigh In on Whether Plaintiff Will Face Charges (9 pages). |
| B | Controversial Saginaw Doctor Who Owes Bank $141K Skips Court to File Bankruptcy in South Carolina (10 pages). |
| C | IRS Seeks $74,204 in Back Taxes from Controversial Saginaw Doctor (11 pages). |
| D | Judge Orders Saginaw Township Doctor to Pay $131K for Not Answering Lawsuit (11 pages). |
| E | Oregon Physician Sues Saginaw Township Doctor Again in Hopes of Getting $21K (7 pages). |
| F | Saginaw Township Doctor Files Last-Minute Bankruptcy Again to Avoid $551K Judgment (15 pages). |
| G | Saginaw Township Doctor's Refusal to Follow Court Orders Leads Judge to Dismiss Suit (10 pages). |
| H | UP Officials Drive Six Hours to Confront Saginaw Doctor Accused of Withholding 43 Death Certificates (16 pages). |
| I | Saginaw County Circuit Court records request submitted under the name Todd Atkins. |
| J | Verified Declaration of David L. Stockman, M.D. concerning actual distress and family-safety concerns. |
| K | Cole Waterman a/k/a Cole Waters: Personal Promotion and MLive Social-Media Republication Series (12 pages). |
| L | Luke Solo Family Facebook Account: Repeated Comment and Link Series (8 pages). |
| M | Briann Summersett: Comment, Public-Pressure, and Republication Series (9 pages). |
| N | Briann Summersett: Restricted Forensic-Workspace Post Series (3 pages). |
| O | American Business Google Profile and Reviews (4 pages). |
| P | Shane Starr Custom T-Shirt Display and Jennifer Norfleet Publication (1 page). |
| Q | Third-Party Escalation and Ratification Context (2 pages). |

# DEDUPLICATED EXHIBIT PACKET

**David L. Stockman, M.D. v. Cole Waterman a/k/a Cole Waters, et al.**

Exact duplicate image files and redundant crops were removed. The clearer uploaded Cole Waters screenshot is used in Exhibit K. Exhibit P specifically identifies Shane Starr's front-and-rear custom-shirt display.

## INDEX


**Exhibit A** - AG's Office to Weigh In on Whether Plaintiff Will Face Charges

**Exhibit B** - Controversial Saginaw Doctor Who Owes Bank $141K Skips Court to File Bankruptcy in South Carolina

**Exhibit C** - IRS Seeks $74,204 in Back Taxes from Controversial Saginaw Doctor

**Exhibit D** - Judge Orders Saginaw Township Doctor to Pay $131K for Not Answering Lawsuit

**Exhibit E** - Oregon Physician Sues Saginaw Township Doctor Again in Hopes of Getting $21K

**Exhibit F** - Saginaw Township Doctor Files Last-Minute Bankruptcy Again to Avoid $551K Judgment

**Exhibit G** - Saginaw Township Doctor's Refusal to Follow Court Orders Leads Judge to Dismiss Suit

**Exhibit H** - UP Officials Drive Six Hours to Confront Saginaw Doctor Accused of Withholding 43 Death Certificates

**Exhibit I** - Todd Atkins Circuit Court records request.

**Exhibit J** - Verified Declaration of David L. Stockman, M.D.

**Exhibit K** - Cole Waterman a/k/a Cole Waters: Personal Promotion and MLive Social-Media Republication Series (12 page(s)).

**Exhibit L** - Luke Solo Family Facebook Account: Repeated Comment and Link Series (8 page(s)).

**Exhibit M** - Briann Summersett: Comment, Public-Pressure, and Republication Series (9 page(s)).

**Exhibit N** - Briann Summersett: Restricted Forensic-Workspace Post Series (3 page(s)).

**Exhibit O** - American Business Google Profile and Reviews (4 page(s)).

**Exhibit P** - Shane Starr Custom T-Shirt Display and Jennifer Norfleet Publication (1 page(s)).

**Exhibit Q** - Third-Party Escalation and Ratification Context (2 page(s)).


CIRCUIT COURT RECORDS OFFICE
SAGINAW, MICHIGAN
FILED
**July 27, 2026**
VANESSA GUERRA
SAGINAW COUNTY CLERK

# EXHIBIT A

**AG's Office to Weigh In on Whether Plaintiff Will Face Charges**

Unlimited Digital Access - Start Today for $1 - Limited Time Offer

Advertisement

Lomaira™ (phentermine hydrochloride USP) tablets

Is Your Patient Done With a GLP-1?

LEARN MORE

K30394010125

INDICATION

Lomaira™ (phentermine hydro
tablets, CIV is a prescription
short period of time (a few w
reduction and should be used
exercise and a reduced-calor
adults with an initial BMI* of
27 or more (overweight) with

# AG's Office to weigh in on if beleaguered Saginaw Township doctor will face charges

Updated: Jun. 14, 2024, 4:57 p.m. | Published: Jun. 14, 2024, 2:04 p.m.



Michigan Attorney General Dana Nessel speaks during a news conference Sept. 19, 2022. (Jake May/The Flint Journal via AP, File) AP

By Cole Waterman | Cole_Waterman@mlive.com

SAGINAW, MI — Whether a beleaguered Saginaw County doctor will face criminal charges for allegedly paying a former employee with bogus checks is to be decided by an out-of-county prosecutor.

Saginaw Township Police Detective Sgt. Chad Brooks confirmed Dr. Donald Higgs on May 3 filed a report regarding receiving insufficient checks from his former employer, dermatopathologist Dr. David L. Stockman of Michigan Institute of Forensic Science & Medicine. Police investigated the matter and sent their reports to the Saginaw County Prosecutor's Office.

Advertisement

Would you

novartis.com | S

Chief Assistant Prosecutor Blair N. Stevenson said he is forwarding the reports to the the Michigan Attorney General's Office to request a special prosecutor evaluate it. Stevenson said he was doing so to avoid any appearances of impropriety, as Stockman and his company are engaged in civil litigation that could see prosecutor's office staff called as witnesses.

Subscribe now to continue reading

Monthly subscriptions renew automatically. Cancel anytime.

$10/Month
MLive.com Basic Access
Automatically renews
Subscribe Now

BEST OFFER
$15/Month
MLive.com All Access plus 8 regional daily online newspapers
Automatically renews
Subscribe Now

Day Pass for $5
24 hours of Basic Access
No commitment
Purchase

View All Offers

If AG staff determine a special prosecutor is warranted, they can either try the case themselves or forward it to the Prosecuting Attorneys Coordinating Council. That agency would then assign another county prosecutor's office to handle the matter.

Advertisement

-50%
$253
$231
$43
-46%
$198.60
$231

Higgs, a forensic pathologist, said he worked for MIFSM from February through early December 2023. Higgs moved his family to Michigan from New York state to accept the position.

Higgs was promised a salary, moving expenses, and no interruption of his benefits. His first three paychecks from MIFSM bounced, though he later received payment, he said.

"The excuses I was given was that the checks were drawn from the wrong bank or that I didn't fill out the proper paperwork," Higgs said. "I am not the only forensic pathologist who's been down this road."

After Oct. 1, he ceased getting paid, although his W-2 forms did not reflect this, he asserted. He also never received reimbursement for the moving expenses he incurred, he said.

"It certainly didn't turn out to be what it was initially represented to be," Higgs said of his experience with MIFSM.

Saginaw County in 2019 entered into a 10-year contract with MIFSM to provide medical examination duties such as investigating causes of death and performing autopsies. The county's existing medical examiner since 2014, Dr. Russell Bush, was hired by MIFSM and designated as the "assigned personnel."

Arenac, Alcona, Ogemaw, and Gladwin counties also contracted with MIFSM, with Bush appointed as "assigned personnel" in each jurisdiction.

Stockman fired Bush in November 2021 but claimed to county officials he had "stepped down," according to public records.

Stockman made the same claim to officials in several other counties where Rush worked, the suit claims.

Saginaw County in 2021 terminated its contract with MIFSM, citing Bush's unauthorized removal and Stockman allegedly performing autopsies despite not having proper certification to do so. Thereafter, the county reaffirmed Bush as its medical examiner.

MIFSM in December 2021 filed a suit against Bush, alleging he breached fiduciary duties, engaged in tortious interference, and usurped corporate opportunities. MIFSM also issued a media release in April 2022, stating Bush was fired for "incompetence and misleading/potentially false credentials."

The following October, attorney Stephan Gaus filed a countersuit against MIFSM and Stockman on Bush's behalf. The suit contains 10 counts: four counts of tortious interference, two counts each of defamation and intentional infliction of emotional distress, and single counts of breach of contract and express contractual indemnity.

Gaus is preparing a suit on Higgs' behalf.

Another lawsuit filed in Saginaw County Circuit Court in February 2023 alleges federal savings bank TIAA entered into contracts with Stockman and his Specialized Pathology Partners in 2017 and 2019. TIAA agreed to lease them ultrasound and radiology machines, for which Stockman/SPP were to make regular payments.

TIAA alleges Stockman failed to hold up his end of the bargain.

On May 25, 2022, TIAA's attorneys sent a final notice to Stockman, advising him of the delinquency in his payment obligations. They allowed him to cure the debts and advised that if TIAA was not repaid by June 6, 2022, it would seek other remedies.

Since then, Stockman/SPP has not made any payments or returned the leased equipment, which TIAA assumed he kept using at 4798 Wenmar Drive in Saginaw Township.

At least two other lawsuits are pending against Stockman in Genesee County Circuit Court, involving two other doctors previously employed by his entities. Stockman sued both doctors first, who in turn filed countersuits.



## Stories by **Cole Waterman**

**Saginaw man charged in 2003 cold-case homicide competent for trial**

May. 6, 2025, 12:23p.m.

**Saginaw Township doctor files last-minute bankruptcy, again, to avoid $551K judgment**

May. 6, 2025, 11:42a.m.

**Prosecutors reviewing case of Saginaw man killed in ‘suicide by cop’**

May. 5, 2025, 3:00p.m.

**If you purchase a product or register for an account through a link on our site, we may receive compensation. By using this site, you consent to our User Agreement and agree that your clicks, interactions, and personal information may be collected, recorded, and/or stored by us and social media and other third-party partners in accordance with our Privacy Policy.**

### ▼ Subscriptions

MLive.com

Newsletters

The Ann Arbor News

The Bay City Times

The Flint Journal

The Grand Rapids Press

Jackson Citizen Patriot

Kalamazoo Gazette

Muskegon Chronicle

The Saginaw News

---

### ▼ Already a Subscriber

Manage your Subscription

Place a Vacation Hold

Make a Payment

Delivery Feedback

---

### ▼ MLive Sections

Jobs

Autos

Real Estate

Rentals

Classifieds

News

Business

Sports

Advice

High School Sports

Betting

Life

Opinion

Obituaries

---

### ▼ Your Regional News Pages

Saginaw

Jackson

Kalamazoo

Muskegon

Ann Arbor

Bay City

Flint

Grand Rapids

### ▼ Mobile

Mobile apps

### ▼ More on MLive

Video

Weather

Post a job

Archives

Classifieds

Sell your car

Sell/Rent your home

Sponsor Content

### ▼ Follow Us

Twitter

Facebook

YouTube

RSS

ADVANCE LOCAL

Use of and/or registration on any portion of this site constitutes acceptance of our User Agreement, (updated 8/1/2024) and acknowledgement of our Privacy Policy, and Your Privacy Choices and Rights (updated 1/1/2025).

© 2025 Advance Local Media LLC. All rights reserved (About Us).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

Community Rules apply to all content you upload or otherwise submit to this site.

**YouTube's privacy policy** is available here and **YouTube's terms of service** is available here.

Ad Choices

# EXHIBIT B

**Controversial Saginaw Doctor Who Owes Bank $141K Skips Court to File Bankruptcy in South Carolina**

Subscribe

Unlimited Digital Access - Start Today for $1 - Limited Time Offer

Advertisement

SAGINAW AND BAY CITY NEWS

# Controversial Saginaw doctor who owes bank $141K skips court to file bankruptcy in South Carolina

Updated: Apr. 03, 2025, 3:16 p.m. | Published: Apr. 02, 2025, 4:00 p.m.




Saginaw County District Judge M. Randall Jurrens. (Kaytie Boomer | MLive.com) Kaytie Boomer | MLive.com

By Cole Waterman | Cole_Waterman@mlive.com

SAGINAW, MI — Beset by lawsuits and judgments on all sides, a local doctor was due in Saginaw County Business Court to explain why he hasn't paid any of the nearly $150,000 he owes a federal savings bank. He didn't show up, though, as he was in South Carolina, filing bankruptcy on behalf of one of his many corporations.

It's the latest in a series of legal and financial troubles facing dermatopathologist Dr. David L. Stockman and his various entities.

Advertisement

Stockman was to appear before Saginaw County Business Court Judge M. Randall Jurrens on Friday, March 28, for a debtor discovery examination, during which he would be questioned under oath about his assets. The judge issued a bench warrant for the doctor when he failed to appear, as he first did in March 2024 and again the following January.


mLIVE

Subscribe now to continue reading

Monthly subscriptions renew automatically. Cancel anytime.

$10/Month
MLive.com Basic Access
Automatically renews
Subscribe Now

BEST OFFER
$15/Month
MLive.com All Access plus 8 regional daily online newspapers
Automatically renews
Subscribe Now

Day Pass for $5
24 hours of Basic Access
No commitment
Purchase

View All Offers


Stockman was in federal court in South Carolina that morning, filing Chapter 7 bankruptcy on behalf of Specialized Pathology Partners. Previous court records gave SPP's address as 4798 Wenmar Drive in Saginaw Township, though the bankruptcy filing gives its address as a Fairfield Inn & Suites in Charleston, South Carolina.

For Stockman to have filed bankruptcy in South Carolina, he must have resided there for at least 91 of the previous 180 days

Interestingly, records with the Michigan Department of Licensing and Regulatory Affairs show SPP was dissolved in May 2024. Those records show Stockman was the entity's president, director, treasurer, and secretary.

Friday's hearing stemmed from Jurrens in August 2023 issuing a default judgment against Stockman and SPP in favor of federal savings bank TIAA. TIAA in 2017 and 2019 agreed to lease Stockman and SPP ultrasound and radiology machines.

Stockman/SPP did not make payments on or return the leased equipment.

Jurrens ordered SPP to pay $122,292.42 and Stockman to pay $12,610.86. He further ordered the defendants to pay $6,792.82 to TIAA in costs and attorney fees.

Stockman has made no payments to TIAA or returned the leased equipment, confirmed an attorney representing the bank.

Jurrens in August 2024 issued a second default judgment against Stockman and his entity Great Lakes Bay Staffing Inc., ordering them to pay $131,626.18 to Wildfire Credit Union. Jurrens issued a third default judgment against Stockman on behalf of forensic pathologist Dr. Donald Higgs for about $55,000.

Higgs, a forensic pathologist, moved his family from New York to Michigan to work for Stockman at Michigan Institute of Forensic Science & Medicine in 2023. The checks Higgs received as payment bounced, he alleged.

Higgs has been receiving payments through garnishments of several Michigan counties served by MIFSM, confirmed Higgs' attorney, Stephan M. Gaus.

Higgs also filed a police report over the matter. Saginaw County prosecutors in June 2024 contacted the Michigan Attorney General's Office to request a special prosecutor evaluate the case. The AG's Office in September referred the matter to the Tuscola County Prosecutor's Office.

MLive was unable to reach that office for comment, but records indicate Stockman is not charged with a crime.

Stockman is due before Jurrens again on Monday, April 7, in the matter of a lawsuit filed against him and MIFSM by Dr. Russell L. Bush.

Saginaw County in 2019 entered a 10-year contract with MIFSM to provide medical examination duties such as investigating causes of death and performing autopsies. MIFSM hired Bush, the county's medical examiner since 2014, and designated him as the "assigned personnel." Stockman fired Bush in November 2021 but claimed to county officials he had "stepped down," according to public records.

MIFSM also issued a media release in April 2022 stating Bush was fired for "incompetence and misleading/potentially false credentials."

The county terminated its contract in 2021 due to Bush's unauthorized termination and Stockman allegedly performing autopsies without proper certification. Thereafter, the county reaffirmed Bush as its medical examiner.

Bush's suit went to arbitration overseen by Kenneth W. Schmidt, a former Bay County Circuit Court judge. Schmidt issued an opinion in late February 2025, finding Stockman owed Bush $551,800 and that he acted with intent and malice.

Attorney Gaus, also representing Bush, drafted an award for Judge Jurrens to sign based on Schmidt's opinion.

Jurrens previously ordered Stockman to pay $3,560 in sanctions for his behavior in court and attorney fees. That sum also has not been paid, Gaus said.

Stockman's attorney, James J. Kelly, on March 31 filed a motion to withdraw as the doctor's representative, citing a breakdown in their relationship since Schmidt rendered the award amount.

Two doctors in other states have filed lawsuits against Stockman and his ventures, alleging he hired them to provide remote work for which he did not pay them.

Dr. Robert Odze, a professor of pathology at Harvard Medical School, in February 2023 filed a lawsuit against Stockman and Michigan Health Clinic in the Superior Court of Massachusetts' Suffolk County. MHC is a corporation Stockman owns at 3925 Fortune Blvd. in Saginaw Township.

Washington, D.C.-based dermatologist Dr. Kishore L. Jayakumar in June 2023 filed a federal suit against Stockman and MHC, claiming they did not pay him an estimated $142,369.20 he was owed for his work.

Both of those cases are pending. Attorney Jonathan D. Plaut, representing Odze, said a motion to dismiss was filed by Stockman's attorney in July 2023 and is still awaiting a hearing.

"We haven't started discovery and this case is over two years old," Plaut said. "This causes people to lose confidence in the swift administration of justice. People don't see the courts as a viable venue to redress grievances."

Stockman's licenses as medical doctor and controlled substances provider remain active and are set to expire Sept. 8.

*Want more Bay City- and Saginaw-area news? Bookmark the local Bay City and Saginaw news page or sign up for the free "3@3" daily newsletter for Bay City and Saginaw.*

LEGAL WOES OF DR. DAVID STOCKMAN

**Saginaw Township doctor files last-minute bankruptcy, again, to avoid $551K judgment**

**Oregon physician sues Saginaw Township doctor, again, in hopes of getting $21K she's owed**

**Saginaw doctor files bankruptcy for entity that handled autopsies, delaying $551K defamation judgment**

**Judge orders Saginaw Township doctor to pay $131K for not answering lawsuit**

**Saginaw Township doctor's refusal to follow court orders leads judge to dismiss suit**

**If you purchase a product or register for an account through a link on our site, we may receive compensation. By using this site, you consent to our User Agreement and agree that your clicks, interactions, and personal information may be collected, recorded, and/or stored by us and social media and other third-party partners in accordance with our Privacy Policy.**

Sponsor Content

[Michigan golf destination pro gives tips for players to master hard shots]

Approach holes with tips you need, and a reminder of what you don't.

Bay Mills Resort and Casino



**Is There a Capital Gains Exemption for Seniors?**

Capital gains tax can eat into investment profit. So how can seniors potentially avoid them?

Learn More

**SmartAsset** | Sponsored

## Around the Web

**Click here for more information**

**novartis.com** | Sponsored

**Ye's destroyed Malibu mansion sells again a week after it was listed**

**Homes.com** | Sponsored

**Meta's Mark Zuckerberg is buyer behind secretive $23 million home sale in DC**

**Homes.com** | Sponsored

**Custom Gray Crimson Gradient...**

**KXK** | Sponsored

**Michigan Important Update For Vehicles Driven Less Than 50 Miles a Day**

Don't pay your next auto insurance bill until you read about this!

**Smart Lifestyle Trends** | Sponsored

Learn More

**They Said AI Couldn't Beat Traders. They Were Wrong.**

**FX Market Insights** | Sponsored

Read Now

**AI Bot Flips Wall Street on Its Head: Turns $1K into $50K in Record 30 Days**

A new AI trading robot reportedly generated a return of $14,158 from a $3,200 investment over the course of a week, according to verified trading records and third-party verification by MyFxBook.

**FX Market Insights** | Sponsored

Read More

**Former Detroit Tigers infielder traded to Twins**

MLive.com

**Missing woman found dead in Allegan County**

MLive.com



26-20982-dob Doc 382 Filed 10/13/26 Entered 10/13/26 16:17:28 Page 43 of 61

Advertise with us
Accessibility Statement

## ▼ Subscriptions

MLive.com
Newsletters
The Ann Arbor News
The Bay City Times
The Flint Journal
The Grand Rapids Press
Jackson Citizen Patriot
Kalamazoo Gazette
Muskegon Chronicle
The Saginaw News

## ▼ Already a Subscriber

Manage your Subscription
Place a Vacation Hold
Make a Payment
Delivery Feedback

## ▼ MLive Sections

Jobs
Autos
Real Estate
Rentals
Classifieds
News
Business
Sports
Advice
High School Sports
Betting
Life
Opinion
Obituaries

▼ **Your Regional News Pages**

Saginaw

Jackson

Kalamazoo

Muskegon

Ann Arbor

Bay City

Flint

Grand Rapids

▼ **Mobile**

Mobile apps

▼ **More on MLive**

Video

Weather

Post a job

Archives

Classifieds

Sell your car

Sell/Rent your home

Sponsor Content

▼ **Follow Us**

Twitter

Facebook

YouTube

RSS

| Privacy Policy | User Agreement | ▷Ad Choices

ADVANCE LOCAL

Use of and/or registration on any portion of this site constitutes acceptance of our User Agreement, (updated 8/1/2024) and acknowledgement of our Privacy Policy, and Your Privacy Choices and Rights (updated 1/1/2025).

© 2025 Advance Local Media LLC. All rights reserved (About Us).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

Community Rules apply to all content you upload or otherwise submit to this site.

**YouTube's privacy policy** is available here and **YouTube's terms of service** is available here.

Ad Choices

# EXHIBIT C

**IRS Seeks $74,204 in Back Taxes from Controversial Saginaw Doctor**

One subscription. Five Users. Start Premium Access for $1

Advertisement

SAGINAW AND BAY CITY NEWS

# IRS seeks $74,204 in back taxes from controversial Saginaw doctor

Updated: May. 30, 2025, 12:46 p.m. | Published: May. 30, 2025, 11:00 a.m.




Dr. David L. Stockman (upper left) appears before Saginaw County District Judge M. Randall Jurrens via Zoom. Cole Waterman

By **Cole Waterman | Cole_Waterman@mlive.com**

SAGINAW, MI — There's a new chapter in the bewildering saga of Dr. David L. Stockman, the Saginaw Township physician accused of withholding autopsy reports across the state and beset with lawsuits and bankruptcies.

Now, the IRS is targeting him in hopes of recouping five figures in back taxes.

NEW! Hello, Bay City

SUBSCRIBER EXCLUSIVE NEWSLETTER

Calling Bay City. A weekly newsletter for subscribers only with a personal column from local reporter Joey Oliver and a collection of our local reporting.

Sign Up

Signed in as:
dstockman@gmail.com

By signing up, you agree to our user agreement (including the class action waiver and arbitration provisions), and privacy policy.

Saginaw County sent a letter to Stockman on May 27 informing him the IRS had placed a levy on funds the county was supposed to pay him. Until shortly beforehand, Stockman had not provided the county with eight autopsy reports going back several years.

The county agreed to pay the doctor and his Michigan Institute of Forensic Science and Medicine (MIFSM) $800 for the reports.

Stockman provided the reports but before the county could pay him, the IRS filed its levy requiring Saginaw County to turn over any funds previously earmarked for Stockman. As such, the county paid the $800 directly to the IRS.

The levy states Stockman owes $74,204.14 in taxes dating to 2021.

Saginaw County commissioners in October 2019 signed a 10-year contract with MIFSM to provide medical examination duties such as investigating causes of death and performing autopsies.

MIFSM hired Dr. Russell L. Bush, Saginaw County's medical examiner since 2014, and designated him as the "assigned personnel."

Stockman fired Bush in November 2021 but claimed to county officials he had "stepped down," according to public records.

MIFSM also issued a media release in April 2022 stating Bush was fired for "incompetence and misleading/potentially false credentials."

Saginaw County terminated its contract in 2021 due to Bush's unauthorized termination and Stockman allegedly performing autopsies without proper certification. Thereafter, the county reaffirmed Bush as its medical examiner.

Bush filed a lawsuit against Stockman, which went to arbitration overseen by Kenneth W. Schmidt, a former Bay County Circuit Court judge. Schmidt in late February 2025 issued an opinion finding Stockman and MIFSM owed Bush $551,800. Schmidt also found Stockman acted with intent and malice in defaming Bush.

Numerous other counties throughout the state also contracted with MIFSM to provide autopsy services. All but the Upper Peninsula's Gogebic County have since ended their contracts with the agency.

Marquette County Commission Chairman Joseph Derocha and Undersheriff Lowell A. Larson Jr. on May 20 drove to MIFSM's office at 4707 McLeod Drive East to confront him over not submitting 43 death certificates. Stockman missed two scheduled appointments to meet with the men, but his staff provided 18 of the reports.




Dr. David L. Stockman's Michigan Institute of Forensic Science & Medicine in Saginaw Township, with a Marquette County Sheriff's car in front of it. Cole Waterman

Death certificates are necessary for decedents' loved ones to receive life insurance proceeds and other benefits.

Dr. Bush and Marquette County officials have filed complaints with the Michigan Board of Medicine regarding Stockman not fulfilling his obligations.

Stockman and his various entities have filed five bankruptcies in recent months, four of which have been dismissed. He twice filed Chapter 11 bankruptcy on behalf of his landholding company, Becker-Pressente LLC, with U.S. Bankruptcy Judge Daniel S. Opperman dismissing it on May 22 and barring him from refiling it within 180 days.

Stockman on March 28 skipped a hearing before Saginaw County Business Judge M. Randall Jurrens as he was in South Carolina filing Chapter 7 bankruptcy on behalf of another of his entities, Specialized Pathology Partners. While previous court records gave SPP's address as 4798 Wenmar Drive in Saginaw Township, the bankruptcy filing gives its address as a Fairfield Inn & Suites in Charleston, South Carolina.

Records with the Michigan Department of Licensing and Regulatory Affairs show SPP was dissolved in May 2024. Those records show Stockman was the entity's president, director, treasurer, and secretary.

Stockman filed SPP's bankruptcy without an attorney's representation, as he did the Becker-Pressente bankruptcies, something that is not permitted. Due to this, a judge dismissed the South Carolina bankruptcy filing on April 28.

Stockman on April 4 filed Chapter 11 bankruptcy on MIFSM's behalf, putting an automatic stay on Jurrens signing a judgment against Stockman in Bush's favor. Stockman delayed Jurrens' ruling again on May 5, when he filed Chapter 11 bankruptcy as an individual.

The MIFSM bankruptcy was also dismissed by Judge Opperman on May 22, again for failure of an attorney's appearance. This has lifted the automatic stay in Dr. Bush's case, meaning Jurrens is likely to sign a judgment ordering Stockman to pay Bush the $551,800 sum at a hearing scheduled for June 3.

Opperman dismissed Stockman's individual bankruptcy filing on May 29.

**More financial woes**

Federal savings bank TIAA in 2017 and 2019 agreed to lease Stockman and SPP ultrasound and radiology machines. Stockman/SPP did not make payments on or return the leased equipment.

TIAA sued Stockman/SPP, with Judge Jurrens in August 2023 issuing a default judgment in the bank's favor. Jurrens ordered SPP to pay $122,292.42 and Stockman to pay $12,610.86. He further ordered the defendants to pay $6,792.82 to TIAA in costs and attorney fees.

Stockman has made no payments to TIAA or returned the leased equipment, confirmed an attorney representing the bank.

Jurrens in August 2024 issued a second default judgment against Stockman, his entities Michigan Health Clinics and Great Lakes Bay Staffing Inc., and MHC Administrative Director Magdalena Perez ordering them to pay $131,626.18 to Wildfire Credit Union. Jurrens issued a third default judgment against Stockman on behalf of forensic pathologist Dr. Donald Higgs for about $55,000.

Higgs moved his family from New York to Michigan to work for Stockman at MIFSM in 2023. The checks Higgs received as payment bounced, he alleged.

Higgs has been receiving payments through garnishments of several Michigan counties served by MIFSM, confirmed his attorney, Stephan M. Gaus.

Higgs also filed a police report over the matter. Saginaw County prosecutors in June 2024 contacted the Michigan Attorney General's Office to request a special prosecutor evaluate the case. The AG's Office in September referred the matter to the Tuscola County Prosecutor's Office, where it remains under review.

Colorado-based North Star Scientific Solutions in February 2023 filed a federal lawsuit against Stockman's Michigan Health Clinics. North Star alleged MHC was engaged in the cannabis industry and sought out their services "to develop a detailed project plan for the setup and implementation of cannabis testing services per the Michigan Cannabis Regulatory Agency."

North Star and MHC entered into a consulting agreement in 2021, outlining compensation terms and fee structure. MHC failed to honor the agreement, North Star alleged.

Around February 2023, MHC paid about $50,000 to settle its overdue invoices, the suit states. MHC assured North Star payments would improve once it obtained its license, leading North Star to continue its work in good faith.

MHC received its license in July 2023 yet did not pay its outstanding invoices to North Star, the suit alleged. MHC promised to pay between $10,000 and $15,000, but did not do so, the suit alleged.

North Star's communication with MHC ended in October 2023, at which point outstanding invoices totaled $101,441.22, plus a 5% late fee.

U.S. District Judge Gordon P. Gallagher on May 9 entered a default judgment in North Star's favor, ordering MHC to pay $101,441.22 in compensatory damages, attorney fees, and interest.

At least three physicians in Massachusetts, Oregon, and Washington, D.C., have also sued Stockman and his entities, alleging they went unpaid for work they performed.

Stockman's licenses to practice medicine and prescribe medication expire Sept. 8.

*Want more Bay City- and Saginaw-area news? Bookmark the local Bay City and Saginaw news page or sign up for the free "3@3" daily newsletter for Bay City and Saginaw.*

## LEGAL WOES OF DR. DAVID STOCKMAN

**Saginaw doctor files federal court motion, avoiding $551,800 defamation payment**

**UP officials drive 6 hours to confront Saginaw doctor accused of withholding 43 death certificates**

**Michigan doctor under fire: 22 autopsy reports withheld from UP families**

**Saginaw Township doctor files last-minute bankruptcy, again, to avoid $551K judgment**

**Oregon physician sues Saginaw Township doctor, again, in hopes of getting $21K she's owed**


Cole Waterman

Cole Waterman is a public safety reporter for MLive. He predominantly covers crime in Saginaw and Bay counties. He attended Delta College and Saginaw Valley State University. He has been a reporter with MLive...more

cole_waterman@mlive.com

**Sponsor Content**

## [Springfield Urgent Care bridges the gap between primary and emergency care for Michigan patients]

Affordability, convenience, comprehensive medical services and high-quality care highlight how Springfield Urgent...

Springfield Urgent Care




**▼ About Us**

[Contact Us]

[Jobs at MLive]

[MLive Media Group]

[Our Team]

[Advertise With Us]

[Accessibility Statement]

### ▼ Subscriptions

MLive.com

Newsletters

The Ann Arbor News

The Bay City Times

The Flint Journal

The Grand Rapids Press

Jackson Citizen Patriot

Kalamazoo Gazette

Muskegon Chronicle

The Saginaw News

---

### ▼ Already a Subscriber

Manage your Subscription

Place a Vacation Hold

Make a Payment

Delivery Feedback

---

### ▼ MLive Sections

Jobs

Autos

Real Estate

Rentals

All Classifieds

All News

All Business

All Sports

Advice

High School Sports

Betting

All Life & Culture

Opinion

Obituaries

---

## ▼ Your Regional News Pages

Saginaw

Jackson

Kalamazoo

Muskegon

Ann Arbor

Bay City

Flint

Grand Rapids

## ▼ Mobile

Mobile apps

## ▼ More on MLive

Video

Weather

Post a job

Classifieds

Sell your car

Sell/Rent your home

Sponsor Content

Newspapers.com Archive

## ▼ Follow Us

Facebook

YouTube

RSS

Privacy Policy | User Agreement | Ad Choices

ADVANCE LOCAL

Use of and/or registration on any portion of this site constitutes acceptance of our User Agreement, (updated 8/1/2024) and acknowledgement of our Privacy Policy, and Your Privacy Choices and Rights (updated 1/1/2026).

© 2026 Advance Local Media LLC. All rights reserved (About Us).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Local.

Community Rules apply to all content you upload or otherwise submit to this site.

**YouTube's privacy policy** is available here and **YouTube's terms of service** is available here.

Ad Choices

# EXHIBIT D

**Judge Orders Saginaw Township Doctor to Pay $131K for Not Answering Lawsuit**

Subscribe

Flash Sale! Unlimited Digital Access - $5 for the first month

Advertisement




SAGINAW AND BAY CITY NEWS

# Judge orders Saginaw Township doctor to pay $131K for not answering lawsuit

Published: Aug. 05, 2024, 1:35 p.m.



## Unlock all of MLive.com

Subscribe for Unlimited Digital Access, including high school sports coverage, print-quality photo downloads and 10 gift articles each month. Your support powers local journalism that impacts our community.

| $5 Day Pass | $5 First Month | BEST OFFER $75 First Year |
|---|---|---|
| No commitment | Renews at $10/Month | Renews at $100/Year |

By Cole Waterman | Cole_Waterman@mlive.com

SAGINAW, MI — For yet again ignoring a lawsuit leveled against him for failure to pay his debts, a Saginaw Township doctor has been ordered to pay a six-figure sum. It's the second time in less than a year a judge has issued such a judgment against him.

Saginaw County District Judge M. Randall Jurrens on Thursday, Aug. 1, issued a default judgment against dermatopathologist Dr. David L. Stockman, Magdalena Perez, and Great Lakes Bay Staffing Inc. in favor of Wildfire Credit Union. Jurrens ordered the defendants to pay $131,626.18.

Advertisement

Wildfire's attorney, Karl L. Wenzloff, sought the judgment on the grounds that Stockman had failed to respond to the lawsuit that was filed against him in April 2024.

The suit claimed Stockman owns BPE Group LLC, which itself owns half of Great Lakes Bay Staffing, with Perez owning the other half. In June 2023, Stockman and Perez as representatives of Great Lakes Bay Staffing opened a draft account with Wildfire.

In August 2023, Stockman and Perez began depositing checks into the account. The checks were drawn from an account owned by Michigan Health Clinic, a corporation Stockman also owns.

They also requested wire transfers to a payroll account, which at times left the draft account empty and overdrawn, the suit stated.